IN THE MATTER OF SHIRLEY DINNERSTEIN.

Norfolk.   June 15, 1978. — June 30, 1978.

Present: HALE, C.J., KEVILLE, & ARMSTRONG, JJ.

*Medicine,* Withholding medical treatment. *Probate Court,* Withholding medical treatment.

In the case of a patient with an unremitting, incurable mortal illness, the law of this Commonwealth does not prohibit a course of medical treatment which excludes attempts at resuscitation in the event of cardiac or respiratory arrest and the lawfulness of a physician's order to that effect does not depend on prior judicial approval. [468–474]

CIVIL ACTION commenced in the Probate Court for the county of Norfolk on April 25, 1978.

The case was reported by *Sullivan,* J.

*Ronald B. Schram (Daniel T. Roble* with him) for the petitioners.

*Beverly W. Boorstein,* guardian ad litem, for Shirley Dinnerstein.

ARMSTRONG, J. This case, which comes to us on a report (without decision but with extensive findings of fact) from a judge of a Probate Court, turns on the question whether a physician attending an incompetent, terminally ill patient may lawfully direct that resuscitation measures be withheld in the event of cardiac or respiratory arrest where such a direction has not been approved in advance by a Probate Court.

The patient is a sixty-seven year old woman who suffers from a condition known as Alzheimer's disease. It is a degenerative disease of the brain of unknown origin, described as presenile dementia, and results in destruction of brain tissue and, consequently, deterioration in

brain function. The condition is progressive and unremitting, leading in stages to disorientation, loss of memory, personality disorganization, loss of intellectual function, and ultimate loss of all motor function. The disease typically leads to a vegetative or comatose condition and then to death. The course of the disease may be gradual or precipitous, averaging five to seven years. At this time medical science knows of no cure for the disease and no treatment which can slow or arrest its course. No medical breakthrough is anticipated.

The patient's condition was diagnosed as Alzheimer's disease in July, 1975, although the initial symptoms of the disease were observed as early as 1972. She entered a nursing home in November, 1975, where her (by that time) complete disorientation, frequent psychotic outbursts, and deteriorating ability to control elementary bodily functions made her dependent on intensive nursing care. In February, 1978, she suffered a massive stroke, which left her totally paralysed on her left side. At the present time she is confined to a hospital bed,[1] in an essentially vegetative state, immobile, speechless, unable to swallow without choking, and barely able to cough. Her eyes occasionally open and from time to time appear to fix on or follow an object briefly; otherwise she appears to be unaware of her environment. She is fed through a naso-gastric tube, intravenous feeding having been abandoned because it came to cause her pain. It is probable that she is experiencing some discomfort from the naso-gastric tube, which can cause irritation, ulceration, and infection in her throat and esophageal tract, and which must be removed from time to time, and that

[1] The Medicare program terminated assistance in April, 1978, because, although she was hospitalized, her care was essentially custodial rather than oriented to treatment. The same care could be provided in some nursing homes, although a suitable placement has not been found. Most nursing homes would not have a team available capable of sophisticated resuscitation efforts in the event of cardiac or respiratory arrest.

procedure itself causes discomfort. She is catheterized and also, of course, requires bowel care. Apart from her Alzheimer's disease and paralysis, she suffers from high blood pressure which is difficult to control; there is risk in lowering it due to a constriction in an artery leading to a kidney. She has a serious, life-threatening coronary artery disease, due to arteriosclerosis. Her condition is hopeless, but it is difficult to predict exactly when she will die. Her life expectancy is no more than a year, but she could go into cardiac or respiratory arrest at any time. One of these, or another stroke, is most likely to be the immediate cause of her death.

In this situation her attending physician has recommended that, when (and if) cardiac or respiratory arrest occurs, resuscitation efforts should not be undertaken. Such efforts typically involve the use of cardiac massage or chest compression and delivery of oxygen under compression through an endotracheal tube into the lungs. An electrocardiogram is connected to guide the efforts of the resuscitation team and to monitor the patient's progress. Various plastic tubes are usually inserted intravenously to supply medications or stimulants directly to the heart. Such medications may also be supplied by direct injection into the heart by means of a long needle. A defibrillator may be used, applying electric shock to the heart to induce contractions. A pacemaker, in the form of an electrical conducting wire, may be fed through a large blood vessel directly to the heart's surface to stimulate contractions and to regulate beat. These procedures, to be effective, must be initiated with a minimum of delay as cerebral anoxia, due to a cut-off of oxygen to the brain, will normally produce irreversible brain damage within three to five minutes and total brain death within fifteen minutes.[2] Many of these procedures are obviously highly in-

---

[2] Houts & Haut, Death § 1.01 (3)(d) (Courtroom Medicine Series 1976). The cells of the cerebral cortex, which control intellectual or cognitive functions, are destroyed in three to five minutes of anoxia;

trusive, and some are violent in nature. The defibrillator, for example, causes violent (and painful) muscle contractions which, in a patient suffering (as this patient is) from osteoporosis, may cause fracture of vertebrae or other bones. Such fractures, in turn, cause pain, which may be extreme.

The patient's family, consisting of a son, who is a physician practicing in New York city, and a daughter, with whom the patient lived prior to her admission to the nursing home in 1975, concur in the doctor's recommendation that resuscitation should not be attempted in the event of cardiac or respiratory arrest. They have joined with the doctor and the hospital in bringing the instant action for declaratory relief, asking for a determination that the doctor may enter a "no-code" order[3] on the pa-

the cells of the midbrain and the brain stem, which control the body's vegetative functions, can survive for an additional few minutes, thus making possible a continued vegetative or comatose existence in some cases where circulation is restored after irreversible destruction of cells highest on the neuraxis. *Id.* The process of destruction of brain cells may be delayed by hypothermia (body temperature below 90° F) or central nervous system depressants, such as barbiturates. Ad Hoc Committee of Harvard Medical School to Examine the Definition of Brain Death, A Definition of Irreversible Coma, 205 J.A.M.A. 337 (1968).

[3] The terminology derives from the development in recent years, in acute care hospitals, of specialized "teams" of doctors and nurses trained in the administration of cardiopulmonary resuscitative measures. If a patient goes into cardiac or respiratory arrest, the nurse in attendance causes a notice to be broadcast on the hospital's intercommunications system giving a code word and the room number. The members of the code team converge on the room immediately from other parts of the hospital. In the hospital in question, if the code is broadcast at night, all doctors then in the hospital for whatever reason are expected to respond to the code. A "no-code" order entered in a patient's medical record instructs the nursing staff, as part of the attending physician's ongoing instructions to the nursing staff for the care of the patient, not to summon the code team in the event of cardiac or respiratory arrest. A no-code order is sometimes called ONTR (order not to resuscitate) (Rabkin, Gillerman, & Rice, Orders Not to Resuscitate, 295 New Eng. J. Med. 364 [1976]) or DNR (do not resuscitate) (*In re Quinlan*, 70 N.J. 10, 29, cert. denied sub nom. *Garger* v. *New Jersey*, 429 U.S. 922 [1976]).

tient's medical record without judicial authorization or, alternatively, if such authorization is a legal prerequisite to the validity of a "no-code" order, that that authorization be given. The probate judge appointed a guardian ad litem, who has taken a position in opposition to the prayers of the complaint.

By their action for declaratory relief, the plaintiffs seek a resolution of some uncertainties which have arisen in the aftermath of *Superintendent of Belchertown State Sch.* v. *Saikewicz*, 373 Mass. 728 (1977), which has been interpreted by some in the medical profession as casting doubt upon the lawfulness of an order not to attempt resuscitation of an incompetent, terminally ill patient except where the entry of such an order has been previously determined by a Probate Court to be in the best interests of the patient. See, e.g., Curran, The *Saikewicz* Decision, 298 New Eng. J. Med. 499, 500 (1978); Letter to the Editor from Barnes & others, 298 New Eng. J. Med. 516, 517 (1978). The practical results of such a reading would, of course, be very far reaching, since it is obvious on reflection that cardiac or respiratory arrest will signal the arrival of death for the overwhelming majority of persons whose lives are terminated by illness or old age; indeed, they are part of the normal[4] act of death.

The *Saikewicz* case, in the range of situations to which it applies, requires "judicial resolution of this most difficult and awesome question—whether potentially life-prolonging treatment should be withheld from a person incapable of making his own decision. . . ." 373 Mass. at 759. In this respect the case represents more than a definition of the procedure which must be followed if the doctor or the family or both feel that an available life-

[4] The qualification is necessary because "death" is defined for some purposes solely in terms of complete loss of brain function, or "brain death." See *Commonwealth* v. *Golston*, 373 Mass. 249, 252 (1977). Such a definition is of practical importance principally in cases of traumatic injury to the brain where respiration and circulation are maintained artificially.

prolonging treatment should not be administered to the incompetent patient.[5] It also, implicitly, would appear to establish a rule of law that unless such a court determination has been obtained, it is the duty of a doctor attending an incompetent patient to employ whatever life-saving or life-prolonging treatments the current state of the art has put in his hands. As it cannot be assumed that legal proceedings such as the present one will be initiated in respect of more than a small fraction of all terminally ill or dying elderly patients, the *Saikewicz* case, if read to apply to the natural death of a terminally ill patient by cardiac or respiratory arrest, would require attempts to resuscitate dying patients in most cases, without exercise of medical judgment, even when that course of action could aptly be characterized as a pointless, even cruel, prolongation of the act of dying.[6]

We think it clear that such a result is neither intended not sanctioned by the *Saikewicz* case. This is most strikingly apparent from certain passages of the *Saikewicz* case which are set out in the margin.[7] It is apparent as

[5] Notwithstanding some passages in the *Saikewicz* opinion (e.g., par. 1 of part C, 373 Mass. at 755) which may be read to suggest that judicial approval is required before administering (as opposed to withholding) a life-saving or life-prolonging treatment, we think that the sense of the opinion taken as a whole and a consideration of the practical limitations on the capacity of the judiciary lead to the conclusion that judicial approval is required only where life-saving or life-prolonging treatment is to be withheld (as is reflected in the passage quoted in the text), and that the traditional consent of family, next of kin, or guardian (see *Reddington* v. *Clayman*, 334 Mass. 244, 246-247 [1956]; *Belger* v. *Arnot*, 344 Mass. 679 [1962]; 12 Op. Atty. Gen. 156 [1944]; compare *Sheehan* v. *Commercial Travelers Mut. Acc. Assn.* 283 Mass. 543, 553–554 [1933]) is meant to remain operative in cases where the medical recommendation is in favor of the administration of such a treatment.

[6] See Dunphy, Annual Discourse — On caring for the Patient with Cancer, 295 New Eng. J. Med. 313 (1976), criticizing "the use of positive means to drag out life for a few more dreadful hours, days or weeks."

[7] "... [P]hysicians have begun to realize that in many cases the effect of using extraordinary measures to prolong life is to 'only pro-

well from the factual situation to which the principles of law announced in the case were addressed, from the precedents cited in support of those principles, and from the inherent sense of the case read as a whole, that, when the court spoke of life-saving or life-prolonging treatments, it referred to treatments administered for the purpose, and with some reasonable expectation, of effecting a permanent or temporary cure of or relief from the illness or condition being treated. "Prolongation of life," as used in the *Saikewicz* case, does not mean a mere suspen-

long suffering, isolate the family from their loved one at a time when they may be close at hand or result in economic ruin for the family.' Lewis, Machine Medicine and Its Relation to the Fatally Ill, 206 J.A.M.A. 387 (1968).

"Recognition of these factors led the Supreme Court of New Jersey to observe 'that physicians distinguish between curing the ill and comforting and easing the dying; that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refused to treat the hopeless and dying as if they were curable.' *In re Quinlan*, 70 N.J. 10, 47 (1976).

"The essence of this distinction in defining the medical role is to draw the sometimes subtle distinction between those situations in which the withholding of extraordinary measures may be viewed as allowing the disease to take its natural course and those in which the same actions may be deemed to have been the cause of death. See Elkinton, [The Dying Patient, the Doctor, and the Law, 13 Vill. L. Rev. 740] 743 [1968]. Recent literature suggests that health care institutions are drawing such a distinction, at least with regard to respecting the decision of competent patients to refuse such measures. Rabkin and others, Orders Not to Resuscitate, 293 N.E.J. of Med. 364 (1976). Cf. Beecher, Ethical Problems Created by the Hopelessly Unconscious Patient, 278 N.E.J. of Med. 1425 (1968).

"The current state of medical ethics in this area is expressed by one commentator who states that: 'we should not use *extra-ordinary means of prolonging* life *or its semblance* when, after careful consideration, consultation and the application of the most well conceived therapy it becomes apparent that there is no hope for the recovery of the patient. Recovery should not be defined simply as the ability to *remain alive*; it should mean life without intolerable suffering.' Lewis, *supra*. See Collins, Limits of Medical Responsibility in Prolonging Life, 206 J.A.M.A. 389 (1968); Williamson, Life or Death - Whose Decision? 197 J.A.M.A. 793 (1966).

"Our decision in this case is consistent with the current medical ethos in this area." 373 Mass. at 737–738.

sion of the act of dying, but contemplates, at the very least, a remission of symptoms enabling a return towards a normal, functioning, integrated existence.

It must be borne in mind that the *Saikewicz* case, while discussing incidentally the scope of the doctor's duty to administer treatment, was primarily concerned with the patient's right to refuse treatment and the manner in which the exercise of that right may be secured to persons unable to make the decision for themselves. The case involved a sixty-seven year old, profoundly retarded resident at a State institution for mentally retarded persons. He suffered from leukemia, which was not curable, in the sense of a permanent cure, but which was treatable by chemotherapy, which could cause symptomatic remission, thus making possible an extension of normal, cognitive, functioning existence for a period of months or years. There was evidence that the majority of competent persons similarly situated elect to undergo the treatment, but that the treatment involves uncomfortable and even painful side effects sufficiently serious to cause many reasonable persons to forgo the treatment. The court held that Saikewicz was not to be deprived of the right to decline chemotherapy simply because of his incompetence to make the choice himself, but that such a choice could be made for him by a probate judge placing himself as best he could in the position of Saikewicz, attempting to approximate, subjectively, the decision Saikewicz would make for himself. In so ruling, the court vindicated the right of an incompetent person to decline treatment in a situation where treatment was available, and which therefore presented a substantial question of choice.[8]

---

[8] The *Saikewicz* decision defined two subissues: "First, does a choice exist? . . . Second, if a choice does exist under certain conditions, what considerations enter into the decision-making process?" 373 Mass. at 745.

The same is true of the many cases discussed in the *Saikewicz* decision in reference to the application of the various interests the State might claim in opposition to the individual's right to decline treatment.[9] They all involved a situation of *choice* presented by the availability of a treatment offering hope of restoration to normal, integrated, functioning, cognitive existence.

That is not the situation that presents itself in this case, or in the case of any patient in the terminal stages of an unremitting, incurable mortal illness. The judge's findings make it clear that the case is hopeless and that death must come soon, probably in the form of cardiac or respiratory arrest. Attempts to apply resuscitation, if successful, will do nothing to cure or relieve the illnesses which will have brought the patient to the threshold of death. The case does not, therefore, present the type of significant treatment choice or election which, in light of sound medical advice, is to be made by the patient, if competent to do so. The latter is the type of lay decision

[9] *Application of the President & Directors of Georgetown College, Inc.*, 331 F.2d 1000 (D.C. Cir.), cert. denied, 377 U.S. 978 (1964), *Holmes v. Silver Cross Hosp.*, 340 F. Supp. 125 (N.D. Ill., 1972), *State v. Perricone*, 37 N.J. 463, cert. denied, 371 U.S. 890 (1962), *Raleigh Fitkin-Paul Morgan Memorial Hosp.* v. *Anderson*, 42 N.J. 421, cert. denied, 377 U.S. 985 (1964), *John F. Kennedy Memorial Hosp.* v. *Heston*, 58 N.J. 576 (1971), and *In re Sampson*, 65 Misc. 2d 658 (Fam. Ct. 1970), aff'd 37 App. Div. 2d. 668 (1971), aff'd per curiam, 29 N.Y. 2d 900 (1972), involved potentially life-saving blood transfusions over religious objections. *Long Island Jewish-Hillside Medical Center* v. *Levitt*, 73 Misc. 2d 395, 396 (N.Y. Sup. Ct. 1973), involved amputation of the gangrenous leg of an eighty-four year old "unable to make judgments relative to his health." *Mitchell* v. *Davis*, 205 S.W.2d 812 (Tex. App. 1942), and *In re Karwath*, 199 N.W.2d 147 (Iowa 1972), involved operations necessary to the health of minors. *In re Rotkowitz*, 175 Misc. 948 (N.Y. Dom. Rel. Ct. 1941), involved surgery on a minor to correct deformities over parental objection. *In re Weberlist*, 79 Misc. 2d 753 (N.Y. Sup. Ct. 1974), involved similar surgery on a retarded State ward whose parents could not be found. In *In re Hudson*, 13 Wash. 2d 673 (1942), *In re Green*, 448 Pa. 338 (1972), and *In re CFB*, 497 S.W.2d 831 (Mo. App. 1973), the courts declined to order treatment of minors over parental objections. One case (*In re CFB*) involved psychiatric care; the other two involved surgery to correct deformities.

which the court in the *Saikewicz* case had in mind when
it required judicial approval of a negative decision (see
note 5, *supra*) by the physician in attendance and by the
family or guardian of a patient unable to make the choice
for himself. This case does not offer a life-saving or life-
prolonging treatment alternative within the meaning of
the *Saikewicz* case. It presents a question peculiarly with-
in the competence of the medical profession of what
measures are appropriate to ease the imminent passing
of an irreversibly, terminally ill patient in light of the
patient's history and condition and the wishes of her
family.[10] That question is not one for judicial decision, but
one for the attending physician, in keeping with the high-
est traditions of his profession, and subject to court re-
view only to the extent that it may be contended that he
has failed to exercise "the degree of care and skill of the
average qualified practitioner, taking into account the
advances in the profession." *Brune* v. *Belinkoff*, 354
Mass. 102, 109 (1968).

The case is remanded to the Probate Court, where a
judgment is to enter in accordance with the prayers of the
complaint for declaratory relief, declaring that on the

---

[10] There is at least some question whether the use of cardiopulmo-
nary resuscitation would be regarded as sound medical practice in the
case of cardiac or respiratory arrest which occurs as the anticipated
or expected end of a terminal illness. See National Conference on
Standards for Cardiopulmonary Resuscitation and Emergency Car-
diac Care, Standards for Cardiopulmonary Resuscitation (CPR) and
Emergency Cardiac Care (ECC), 227 J.A.M.A. 837, 864 (1974): "The
purpose of cardiopulmonary resuscitation is the prevention of sudden,
unexpected death. Cardiopulmonary resuscitation is not indicated in
certain situations, such as in cases of terminal irreversible illness
where death is not unexpected or where prolonged cardiac arrest
dictates the futility of resuscitation efforts. Resuscitation in these
circumstances may represent a positive violation of an individual's
right to die with dignity. When CPR is considered to be contraindicat-
ed for hospital patients, it is appropriate to indicate this in the pa-
tient's progress notes. It also is appropriate to indicate this on the
physician's order sheet for the benefit of nurses and other personnel
who may be called upon to initiate or participate in cardiopulmonary
resuscitation."

findings made by the judge the law does not prohibit a course of medical treatment which excludes attempts at resuscitation in the event of cardiac or respiratory arrest and that the validity of an order to that effect does not depend on prior judicial approval.[11]

*So ordered.*

---

[11] The probate judge reported seven specific questions to this court for decision, some of which (questions A, B, and C) are implicitly answered by what has been set out in the opinion. Questions D and E, to the extent not answered in the opinion, probe the legal significance of assent by a patient's family or guardian to the entry of a no-code order. In view of the fact that the attending physician, the immediate family of Mrs. Dinnerstein, and the temporary guardian appointed by the Probate Court, are all in agreement on the proper course of action, the present case does not require resolution of such questions, and we feel that their determination is better left to resolution in the context of a concrete, adversary proceeding. We regard question F as presenting a medical, rather than a legal, question, to be answered in accordance with sound medical practice in consideration of the individual patient's condition and prognosis. The final question (G) concerns the source of payment of a guardian ad litem appointed in accordance with the procedures suggested in the *Saikewicz* case (373 Mass. at 757). The answer to this question is, in our view, neither clear nor easily resolved, and, although we appreciate the practical importance in probate practice of having the question resolved at an early date, we feel that it should not be answered in the context of the instant complaint for declaratory relief, which raises no question in that regard, and on an appellate record which fails to indicate the existence of a controversy thereon.