## Custody of a Minor (No. 1).

Suffolk. December 7, 1981. — April 5, 1982.

Present: Hennessey, C.J., Liacos, Abrams, Nolan, Lynch, & O'Connor, JJ.

*Minor*, Medical treatment. *Incompetent Person*, Right to refuse medical treatment. *Medicine*, Withholding medical treatment. *Juvenile Court*, Jurisdiction, Withholding medical treatment. *Jurisdiction*, Care and protection of minor. *Parent and Child*, Care and protection of minor. *Practice, Civil*, Parties. *Hospital*.

A Juvenile Court has jurisdiction to determine whether potentially life-prolonging treatment should be withheld in the case of a terminally ill abandoned child found in need of care and protection pursuant to G. L. c. 119, §§ 24-26. [704-705]

A hospital had standing to seek an order directing that extraordinary resuscitative measures in the event of cardiac or respiratory failure not be applied in the case of a terminally ill abandoned child found in need of care and protection pursuant to G. L. c. 119, §§ 24-26. [705-707]

Where a Juvenile Court entered an order withholding potentially life-prolonging treatment from a terminally ill abandoned child found in need of care and protection pursuant to G. L. c. 119, §§ 24-26, the fact that all parties are now in agreement that the order should be removed neither defeated the jurisdiction of the court in the circumstances nor bound it to accept their position. [707-710]

In a proceeding for a court order directing that potentially life-prolonging treatment be withheld in the case of an abandoned infant in the custody of the Department of Social Services, the evidence was sufficient to warrant findings that the child would not live past his first birthday and that the application of heroic medical life-prolonging treatment would involve a substantial degree of body invasion, accompanied by discomfort and pain, and the judge properly applied the doctrine of substituted judgment on the child's behalf in concluding that the child would choose to be discharged from the hospital to a foster home and that life-prolonging treatment should continue to be withheld. [711-714]

Petition filed in the Boston Division of the Juvenile Court Department on June 30, 1981.

The case was heard by *Poitrast*, J.

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Stephen S. Ostrach*, Assistant Attorney General (*Nancy S. Heller & Scott A. Smith*, Assistant Attorney General, with him) for Department of Social Services.

*William A. McDermott, Jr.*, for the minor.

*Paul McCarthy*, guardian ad litem.

*Jeremy A. Stahlin* for the mother.

*Michael J. Beautyman* (*Judith A. Johnson* with him) for New England Medical Center.

*William G. Crane & Jonathan Brant*, for Developmental Disabilities Law Center, amicus curiae, submitted a brief.

LIACOS, J. On June 30, 1981, a social worker at New England Medical Center (NEMC) petitioned the Boston Juvenile Court, pursuant to G. L. c. 119, alleging that a newborn child with serious cardiac problems was in need of care and protection. G. L. c. 119, §§ 24, 26. The child, abandoned by his mother since birth, was a patient at NEMC. After an initial hearing on July 1, 1981, the court ordered temporary and legal custody of the child to the Department of Social Services (DSS), appointed a guardian ad litem and counsel for the child, appointed counsel for the mother, and continued the case for a full evidentiary hearing on September 11, 1981. On that date, the judge found the child in need of care and protection and continued temporary legal custody of the child in the DSS. The judge provided in his order of September 11, 1981, that "[a]ny party to this action may come before this Court for further hearing."

On October 6, 1981, because of adverse changes in the child's condition, physicians at NEMC asked the DSS and the child's guardian ad litem for their consent to a "no code" order.[1] The DSS, as a matter of policy, declined to consent

---

[1] A "no code" order, given on behalf of a terminally ill patient and implemented by his attending physician, is placed in the patient's medical record and directs a hospital and its staff not to apply extraordinary

to the "no code" order. The guardian ad litem also declined to consent. NEMC then requested the Boston Juvenile Court to decide whether a "no code" order was appropriate.[2]

A hearing was held before the Juvenile Court judge on October 9, 1981. Respective counsel for NEMC, for DSS, for the mother, and for the child participated in the hearing, as did the guardian ad litem. After hearing the evidence, the judge entered findings of fact and an order permitting the administrator of NEMC to enter a "no code" order in the medical record of the child "so that if cardiac and or respiratory arrest occurs no heroic medical life-prolonging treatment should be administered." The judge further ordered that (1) all other ongoing medical treatment for the child continue; (2) any change in the child's condition that might lead to a change in the court's order be reported to the court, and (3) at the request of any party, the court would hear further evidence.

The child's counsel and the guardian ad litem obtained a stay of this order from a single justice of this court on the same day. On October 14, 1981, they filed an appeal with the Appeals Court. While the appeal was pending, NEMC asked the Juvenile Court to revoke the October 9 order on the basis of a change in the child's condition. Further hearings were held before the same judge on October 23 and 27, 1981. The judge made further findings of fact and issued an additional order on October 28, 1981, in which he author-

---

intrusive resuscitative measures in the event of cardiac or respiratory failure. "The terminology derives from the development in recent years, in acute care hospitals, of specialized 'teams' of doctors and nurses trained in the administration of cardiopulmonary resuscitative measures. If a patient goes into cardiac or respiratory arrest, the nurse in attendance causes a notice to be broadcast on the hospital's intercommunications system giving a code word and the room number. The members of the code team converge on the room immediately from other parts of the hospital." *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 469 n.3 (1978).

[2] The child's natural mother and maternal grandparents did not want to be involved in the hearings or in making any decision regarding the child's condition and treatment. The mother had never seen or visited the child from the time of his birth.

ized the discharge of the child from NEMC and continued in effect the prior "no code" order of October 9.

On October 20, 1981, we transferred the appeal from the October 9, 1981, order on our own motion to this court. On November 2, 1981, the DSS appealed from both the October 9 and 28 orders of the Juvenile Court. The attorney for the child and the guardian ad litem appealed from the October 28 order on November 4, 1981. The child was discharged from NEMC on October 23, 1981. A single justice of this court again stayed the Juvenile Court's order of "no code" on November 16, 1981, after readmission of the child to NEMC. The child then was again discharged from NEMC.

On November 2 the single justice set this case for argument before the full court on December 7, 1981. He found that "[t]he parties agreed that the health, well-being, and medical treatment of the minor child will be unaffected by the decision of this appeal," but that the issues raised are important to the public and to the administration of justice in the Commonwealth.

The attorneys for the child and the guardian ad litem present the following issues: (1) Whether the Boston Juvenile Court has jurisdiction to enter a "no code" order for a minor child found in need of care and protection pursuant to G. L. c. 119, §§ 24, 26; (2) whether NEMC has standing to seek a "no code" order, as it did on October 9, 1981; and (3) whether the judge erred in the application of the "substituted judgment — best interests" tests.

The DSS joins in the third claim of error and additionally urges that this court reformulate the standards to be applied by a judge in resolving such disputes. NEMC urges that the "no code" order of October 28, 1981, should be set aside, and states its views of the appropriate standards to be applied in such cases. The mother's attorney argues the October 28, 1981, order to have been "imprudent." All parties have urged the court to set aside the order of October 28, 1981, albeit on different grounds.[3]

---

[3] We acknowledge the assistance we have received from the brief submitted by amicus curiae, the Developmental Disabilities Law Center.

On December 15, 1981, the court issued an order affirm-
ing the October 9 and October 28 orders of the Juvenile
Court with the notation that a rescript would issue forth-
with. After thoroughly reviewing the facts and procedural
history of the case, we vacated the various stays of the
orders of the Juvenile Court and stated our conclusions as
follows: "We conclude that the Boston Juvenile Court had
ample jurisdiction to enter such orders. We also conclude
that NEMCH had standing to seek such an order. The
judge's findings of fact are amply supported by the evi-
dence, and his conclusions of law are not in error. We note
that at all times the judge has indicated his willingness to
reconsider his order on receipt of evidence of a change in the
medical condition of the minor or in the medical treatment
available to him. We affirm his power to issue such further
orders as may be appropriate in the circumstances." We
then indicated that our opinion would be issued at a later
date. We now issue that opinion.[4]

We summarize the facts. The judge below found that the
minor, at the time of the October 9, 1981, hearing was a
four and one-half month old child who, from birth, suffered
from cyanotic heart disease. This disease is characterized
by inadequate flow of oxygenated blood to the pulmonary
system. Additionally, a cardiac catheterization performed
on May 23, 1981, revealed that the child was suffering from
(a) pulmonary atresia; (b) hypoplastic right ventricle;
(c) hypoplastic pulmonary artery; and (d) small patent duc-
tus arteriosus.

There is no treatment or surgical procedure available,
proven or experimental, which offers any hope for the

---

[4] The DSS filed a petition to "vacate," "reconsider," or "clarify" the
order of December 15, 1981, which was denied on February 1, 1982.
Among the points sought to be raised was the role certain Supplementary
Findings issued by the Juvenile Court may have played in our decision.
Although the Juvenile Court issued these Supplementary Findings in this
case on December 3, 1981, and they were presented to us at oral argument
on December 7, we did not rely on those particular findings in issuing the
December 15 order, nor do we rely on those findings in our opinion.

minor's cure. Death for a child with this minor's diagnosis normally occurs within the first year of life, with or without treatment. There is no research or study which holds promise of aid in the child's condition, nor is there a reasonable hope of a treatment being developed before this child's death.

On May 24, 1981, the cardiac surgical team at NEMC performed palliative surgery for ligation of the patent ductus and the introduction of a modified Blalock-Taussing shunt. The shunt, if functional, would permit greater flow of oxygenated blood to the child's lungs. After some improvement in the child's condition, NEMC discharged the child to a home with a specially-trained foster parent. The prognosis at this time, based on evidence that the Blalock-Taussing shunt was functioning, was that the child had a life expectancy of two months to two years.

Further medical examination of the child on September 22, 1981, indicated that the Blalock-Taussing shunt was nonfunctional, and that an attempt to perform a second shunt was not medically feasible. The child had developed collateral circulation from the heart to the lungs which has thus far sustained him, but this circulation was deemed insufficient to maintain the child's life beyond a few months. The failure of the shunt to function, however, had drastically altered the child's prognosis, as no person suffering from these conditions has ever lived beyond the first year of life.

The child was readmitted to NEMC on September 24, 1981, with a bacterial infection and was placed on a respirator on October 5, 1981. Based on the minor's underlying terminal cardiac condition and the fact that he will die within one year regardless of medical treatment, his physicians at NEMC recommended that a "no code" be entered on the child's medical chart. NEMC sought authorization from the Juvenile Court because both DSS and the guardian ad litem declined to consent to the entry of a "no code" order. The "no code" order would provide that if the child were to go into respiratory or cardiac arrest, no heroic

medical efforts would be made to resuscitate the child. Heroic efforts would be intracardial injection of epinephrine or other drugs, intracardial heart massage, or electric shock treatment. If heroic medical efforts were to be used to resuscitate the child, such efforts would be invasive and traumatic and would cause the child to suffer substantial pain and possible brain damage. The side effects of heroic medical efforts to resuscitate would result in a further weakened condition, substantial pain, and possible neurological and liver damage. The medical testimony was that a heroic effort to resuscitate the child would not be in the child's best interests and would offend medical ethics.

Based on these and other findings of fact the judge concluded that (a) the Juvenile Court has jurisdiction to order the entry of a "no code" order as to a child within its jurisdiction under G. L. c. 119, §§ 24, 26; (b) the best interests of the child would be served by the entry of such an order; (c) that under the "substituted judgment" test enunciated in *Superintendent of Belchertown State School* v. *Saikewicz*, 373 Mass. 728 (1977), the child would, if competent, choose to forgo the use of "heroic" medical efforts to resuscitate, and no State interest would prohibit the entry of a "no code" order.

At the second hearing, in which NEMC sought revocation of the Juvenile Court's prior "no code" order, the court made further findings based on expert medical testimony. At the time of the second hearing, the child was blue in appearance as a result of insufficient oxygen in his blood. Despite his underlying heart condition, however, the child appeared to be of normal development and intelligence for an infant his age.

The child's bacterial infection, present at the time of the October 9 hearing, had cleared up by this October 23 hearing; his life expectancy, however, remained unchanged. Because doctors at NEMC were unable to perform surgery or take any other medical course to improve the child's cardiac condition, they recommended discharge of the child to the foster parents where the child would receive the love and af-

fection unavailable in a hospital setting. Also, the minor would suffer less risk of a severe infection in a foster home than in a hospital.

Finally, the judge found that if the child were in his foster home and developed cardiac arrest, he would likely die because to resuscitate the child requires the action of a physician. Therefore, the judge concluded that discharging the child to his foster home was the equivalent of a "no code" order and declined to vacate his October 9, 1981, order providing for a "no code" entry on the child's hospital record.

We now turn to the legal questions raised by the parties.

1. *Jurisdiction of Juvenile Court.* By statute, the Juvenile Courts of this Commonwealth, upon the petition of any person, may commit a child to the custody of the Department of Social Services if the court adjudges that the child "is in need of care and protection" as that concept is defined in the statute. G. L. c. 119, §§ 24, 26. The judge may then "make any other appropriate order with reference to the care and custody of the child as may conduce to his best interests, including but not limited to . . . physical care including medical . . . care." G. L. c. 119, § 26 (3), as amended through St. 1978, c. 552, § 29. "[T]he Juvenile Courts have a broad mandate to act in furtherance of a child's welfare" and the fact that Juvenile Courts are not courts of general equity jurisdiction "is of no particular relevance to the question of the proper exercise of their powers under the statutes granting jurisdiction to these courts as to matters involving juveniles." *Police Comm'r of Boston* v. *Municipal Court of the Dorchester Dist.*, 374 Mass. 640, 666-667 (1978). The statutory "grant of jurisdiction 'carries with it by implication power to use the necessary means to exercise and enforce that jurisdiction.'" *Id.* at 663, quoting from *Commonwealth* v. *New York Cent. & H.R. R.R.*, 206 Mass. 417, 429 (1910).

Because the juvenile is an abandoned child for whom a care and protection petition was brought and granted and for whom medical care is required, this action was properly before the Juvenile Court pursuant to G. L. c. 119, §§ 24-

26.[5] See *Custody of a Minor*, 375 Mass. 733, 742-743 (1978). Cf. G. L. c. 119, § 27 (de novo appeals to Superior Court from juvenile sessions of District Courts).

This court's decision in *Superintendent of Belchertown State School* v. *Saikewicz, supra* at 755-756, is not to the contrary. Although in *Saikewicz, supra* at 755, we said that "[t]he Probate Court . . . has been given the specific grant of equitable powers to act in all matters relating to guardianship," this is not a guardianship proceeding. Rather, this case is one of proper medical care for an abandoned child. The statutory basis for bringing care and protection proceedings in the Juvenile Court comprehends lack of necessary care. See *Custody of a Minor, supra.*[6] The Juvenile Court is a proper tribunal in which to carry out the Commonwealth's policy to provide substitute parental care and protection of abandoned children. See G. L. c. 119, §§ 1, 25. See *Police Comm'r of Boston, supra* at 667. Cf. *Custody of a Minor, supra* at 744-745 ("nothing in *Saikewicz* derogates from the powers of . . . the District . . . [Court] to hear care and custody proceedings under G. L. c. 119, § 24").

The Juvenile Court, charged with determining the proper physical and medical procedures for a child within its jurisdiction, may decide that some types of care are inappropriate. In *Custody of a Minor (No. 3)*, 378 Mass. 732 (1979), we upheld an order issued in the course of a care and protection proceeding requiring that a child's parents terminate a particular type of treatment. When medical evidence indicates that it is advisable to withhold a particular course of treatment, the court is empowered to enter an order proscribing or terminating those procedures, as well as to order the administration of appropriate medical treatment.

2. *The hospital's (NEMC's) standing.* The guardian ad litem and the appointed attorney for the child additionally

[5] The propriety of the allowance of the care and protection petition is not disputed by any of the parties. The dispute is only as to the validity of the "no code" order.

[6] We do not imply that the Probate Court lacks jurisdiction. See *Custody of a Minor*, 375 Mass. 733, 742 n.3 (1978).

contest the standing of the hospital to initiate this proceeding. General Laws c. 119, § 24, as amended through St. 1980, c. 181, provides that "[t]he Boston juvenile court . . . upon the petition of *any person* alleging on behalf of a child . . . that said child is without . . . necessary and proper physical . . . care . . . or . . . lacks proper attention of . . . [a] guardian with care and custody . . . [may issue an] appropriate order" (emphasis supplied).

In order to facilitate the goal of protecting abandoned, abused, and neglected children, the Legislature gave *any person* the statutory authority to bring a care and protection proceeding. That the words "any person" include a hospital was explicitly recognized in our recent decision, *Custody of a Minor*, 375 Mass. 733 (1978). In that case a child's physician, pursuant to G. L. c. 119, § 24, petitioned the District Court seeking the child's commitment to the legal custody of the Department of Public Welfare for "the limited purpose of providing necessary medical care." We concluded that the allegations fell within the scope of G. L. c. 119, § 24, and that the petitioner "properly invoked the District and Superior Courts' jurisdiction under the care and protection statute." *Id.* at 743. Implicit in the facts of *Custody of a Minor* was a recognition that the physician and his staff at Massachusetts General Hospital were the only parties who had knowledge of the child's serious medical condition and were in a position to seek judicial intervention in the child's best interests. A similar petition, initiated by a psychiatric social worker at the Beth Israel Hospital, was the basis of a care and protection order reviewed by this court in *Custody of a Minor (No. 2)*, 378 Mass. 712 (1979). Although we reversed and remanded the decision of the Appellate Division of the Boston Juvenile Court on other grounds, we again implicitly recognized the standing of a hospital psychiatric social worker to initiate a petition under G. L. c. 119, § 24. Indeed, a significant number of care and protection petitions are initiated by hospitals or members of their staffs, since they are often the only persons outside the family in a position to detect signs of abuse, neglect, or abandonment.

See Shubow & Stahlin, Juveniles in Court: A Look at a System in Flux, 61 Mass. L.Q. 193, 195 (1977).

In the instant case, a social worker at NEMC originally petitioned the court for a care and protection order. In the Juvenile Court's original hearing on the petition, NEMC was represented by counsel. In the court order granting temporary custody of the child to the DSS, the judge stated that "[a]ny party to this action may come before this court for further hearing."[7] As a party to the ongoing care and protection proceedings, NEMC was entitled to bring to the Juvenile Court's attention a change in the child's medical condition. A fortiori, in light of DSS's refusal to be consulted with respect to the entry of a "no code" order, NEMC was the only party in a position to raise the issue before the Juvenile Court. Thus, the Juvenile Court did not err in entertaining a care and protection proceeding brought on behalf of NEMC.

3. *Exercise of Juvenile Court's jurisdiction.* While the parties are in different posture as to the propriety of the initial "no code" order of October 9, 1981,[8] all parties argued before us that the October 28, 1981, order was invalid. NEMC changed its position after the bacterial condition affecting the child on October 9, 1981, was cured. Thus, at the hearing before the Juvenile Court judge and at oral argument before us, all parties urged the removal of the "no code" order. The judge of the Juvenile Court, considering the underlying incurable condition of the child, disagreed. The parties appear to argue that since they are now in agreement, the courts have no further role to play. We disagree.

In *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 474-475 (1978), the Appeals Court held that the decision to enter a

---

[7] The action by the Juvenile Court judge, in granting any party leave to appear before the court for further hearing, makes it unnecessary for us to address the issue whether G. L. c. 119, § 26, which limits the persons who may petition for redetermination of the child's current needs, was a bar to NEMC's action in this particular case.

[8] DSS, the guardian ad litem, and the attorney for the child contest this order. NEMC and the attorney for the mother argue it to be valid.

"no code" order on the medical chart of an irreversibly ter-
minally ill patient, in consultation with the family or the
patient's guardian, did not require prior judicial review. In
*Matter of Spring*, 380 Mass. 629, 635 (1980), we approved
in dictum of the result in *Dinnerstein* as consistent with our
holding in the *Saikewicz* case. We note that there are, how-
ever, relevant distinctions between the *Dinnerstein* and
*Saikewicz* cases. Saikewicz was a ward of the State and had
no family members willing to be involved in decisions re-
garding his medical treatment. *Saikewicz, supra* at 731.
Dinnerstein, however, was not a ward of the State and had
a son and daughter who, in consultation with her attending
physician, agreed to a particular course of medical treat-
ment. *Dinnerstein, supra* at 469. Also, Saikewicz suffered
from leukemia. If treated by chemotherapy, remission of
the leukemia was possible, accompanied by the chance that
his life would be lengthened thereby. *Saikewicz, supra* at
732, 735. Dinnerstein, on the other hand, was the victim of
an unremitting incurable illness, and attempts to apply re-
suscitation would do nothing to cure or relieve the underly-
ing illness. *Dinnerstein, supra* at 474. Although the facts
are different, both cases raise the issue whether and by what
means a person has the right to refuse the invasion of his or
her bodily integrity by refusing extraordinary medical treat-
ment.[9]

In *Spring*, we pointed out that various factors affect the
question of when a court order is required. We stated that,

_____

[9] According to expert testimony in the Juvenile Court, resuscitation ef-
forts, in the event of the child's cardiac arrest, would be highly intrusive.
The judge found that "[t]he institution of a full code order, replete with
heroic medical life-saving techniques (i.e., intracardial medication and
massage, as well as electric shock therapy) involves a substantial degree of
pain and discomfort. It is indeed a substantial invasion of one's body.
Medical testimony confirms that the child presently experiences sensation
and pain while supported by a respirator-ventilator. To inflict such an
invasive and traumatic series of treatments on the already terminally ill
four month old infant with but a few months at most to live, would be
futile. . . .

"The side effects of such a Full Code could result in a further weakened
condition, substantial pain, and possible neurological & liver damage."

among these factors, at least the following were material: "[T]he extent of impairment of the patient's mental faculties, whether the patient is in the custody of a State institution, the prognosis without the proposed treatment, the prognosis with the proposed treatment, the complexity, risk and novelty of the proposed treatment, its possible side effects, the patient's level of understanding and probable reaction, the urgency of decision, the consent of the patient, spouse, or guardian, the good faith of those who participate in the decision, the clarity of professional opinion as to what is good medical practice, the interests of third persons, and the administrative requirements of any institution involved." *Matter of Spring, supra* at 637.

We note here that several of the factors thus enumerated in *Spring* distinguish this case from *Dinnerstein*: (1) The child is a ward of the State in the custody of the DSS; (2) the child's mental faculties have not developed to the point where he is competent to make the decision; (3) the parents have failed to exercise their parental responsibilities toward the child; (4) the child's condition is incurable and the prognosis for successful treatment is negative; (5) medical opinion on diagnosis and prognosis was clear and unanimous as to the child's condition and future; (6) attempts to resuscitate would be painful and intrusive. We add that the child already was within the jurisdiction of the court before the question whether a "no code" order should be made — and continued — arose. In these circumstances we think the language of the court in *Spring* is particularly apt: "When a court is properly presented with the legal question, whether treatment may be withheld, it must decide that question and not delegate it to some private person or group." *Id.* at 639.

Thus, the fact that the parties to the legal proceeding previously initiated come to agreement, while it is to be given deference, neither defeats the jurisdiction of the court in a case such as this nor binds it to accept their position.

Accordingly, we conclude that, although this case appears similar to *Dinnerstein* because the entry of a "no code"

order is in issue and the child is terminally ill, the principles enunciated in *Saikewicz* are applicable. Absent a loving family with whom physicians may consult regarding the entry of a "no code" order, this issue is best resolved by requiring a judicial determination in accordance with the substituted judgment doctrine enunciated in Saikewicz.[10] Cf. *Guardianship of Roe*, 383 Mass. 415, 433-434 (1981) (court prefers judicial resolution of certain legal issues arising from proposed extraordinary medical treatment). In applying this doctrine, the court must attempt to "don the mental mantle" of the child and seek to act on the same motives and considerations as would have moved the child. *Saikewicz, supra* at 752. "By requiring a court to ascertain as nearly as possible the incompetent person's 'actual interests and preferences,' the doctrine of substituted judgment seeks to ensure that the personal decisions concerning the conduct of individual affairs remain, to the greatest extent possible, with the individual. In this way, the free choice and moral dignity of the incompetent person are recognized." *Custody of a Minor*, 375 Mass. at 753. See also *Saikewicz, supra* at 750 n.15. We turn now to consider the propriety of the court's orders.

---

[10] This court has stated its preference for use of the substituted judgment doctrine when the patient is unable to give consent for the withholding or administering of medical treatment. *Matter of Moe, ante* 555 (1982). *Guardianship of Roe*, 383 Mass. 415 (1981). *Matter of Spring*, 380 Mass. 629 (1980). *Commissioner of Correction* v. *Myers*, 379 Mass. 255 (1979). *Custody of a Minor*, 375 Mass. 733 (1978).

"In a case like this one, involving a child who is incompetent by reason of his tender years, we think that the substituted judgment doctrine is consistent with the 'best interests of the child' test. It is true that, when applying the 'best interests' test, the inquiry is essentially objective in nature, and the decisions are made not by, but on behalf of, the child. See Baron, Botsford & Cole, Live Organ and Tissue Transplants from Minor Donors in Massachusetts, 55 B.U.L. Rev. 159, 170 n.54 (1975). Nevertheless, the best interests analysis, like that of the substituted judgment doctrine, requires a court to focus on the various factors unique to the situation of the individual for whom it must act. . . . As a practical matter, the criteria to be examined and the basic applicable reasoning are the same." *Custody of a Minor, supra* at 753. Accord, *Custody of a Minor (No. 3)*, 378 Mass. 732, 745 (1979).

4. *The Juvenile Court's orders.* When considering the appropriateness of a "no code" order, the Juvenile Court judge applied the substituted judgment test and examined the best interests of the child. He concluded that under either theory the result was the same: No heroic medical life-prolonging treatment should be administered to the child at NEMC should cardiac or respiratory arrest occur. The judge's findings were supported by the evidence. His judgment is supported by the findings, and there was no error of law.

The sum of the judge's findings are that this child will not live past his first birthday. A "full code" order would involve a substantial degree of bodily invasion, accompanied by discomfort and pain, and would do nothing but prolong the child's "agony and suffering."

Contrary to what some of the parties to this case suggest, the issue presented here is not one of "right to life." In a "no code" case, the question is not of life or death but the manner of dying and what "measures are appropriate to ease the imminent passing of an irreversibly, terminally ill patient in light of the patient's history and condition." *Dinnerstein, supra* at 475. While this manner of dying may be "a question peculiarly within the competence of the medical profession," *id.*, the possibilities of private decision making present in *Dinnerstein* are not present here. See also *Spring, supra* at 639.

In the instant case there are no family members willing to make a decision in concurrence with NEMC's medical staff regarding the entry of a "no code" order. The DSS, as temporary guardian of the child, refused to consent to such an order. The Juvenile Court was thus faced originally with the traditional adversary proceeding with each side urging a different result. The DSS argues that because there is a presumption in favor of "life," the hospital must prove beyond a reasonable doubt that the child "would not have wished such treatment" or that the "withholding of medical treatment" is in the child's best interest. We think, however, that framing the issue in terms of "life" and the withholding

of medical treatment is a fundamental misconception of the question presented for decision.

The Juvenile Court's order specified that "if cardiac and/or respiratory arrest occurs, no heroic medical life-saving treatment should be administered." There was no issue presented regarding medical treatment for the child's underlying heart defect.[11] Further, there was no question raised as to the appropriateness of medical treatment for effectuating even a temporary cure or relief from the child's condition. Cf. *Saikewicz, supra* at 732, 735. The entry of a "no code" order on the child's medical chart concerns a prohibition against heroic and extraordinary efforts at resuscitation to avoid "a pointless, even cruel, prolongation of the act of dying." *Dinnerstein, supra* at 471.

We are unpersuaded that because this child is a ward of a State agency unwilling to consider a "no code" order, unlike a child with loving and caring parents actively involved in medical decision making, the highest burden of proof must be overcome before entry of a "no code" order. To require judges in reviewing medical judgments to reach a level of moral certainty, see *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850), not only makes judicial approval of "no code" orders highly unlikely, but would cause those terminally ill patients involved to suffer unnecessary pain and loss of dignity. See also *Matter of Moe, ante* 555, 572 (1982) (highest burden of proof effectively precludes recognition of incompetent's rights).

The child's attending physician has testified to such facts as "not one child suffering from the combination of complications affecting this child has lived passed its first year," and that this child is "irreversibly terminally ill." We refuse to lay down a rule requiring a physician to testify that he or she has personal knowledge, to a moral certainty, that the ward's future is hopeless. Such a rule would not only be un-

---

[11] The Juvenile Court's order did, however, specifically state that "[a]ll other ongoing medical treatment with drugs, for the child's bacterial infection should continue."

workable, but hardly realistic. We require no more than the procedure followed by the Juvenile Court judge in this case; the entering of detailed findings, supported by the evidence, "indicating those persuasive factors that determine[d] the outcome." *Moe, supra* at 572.

At the first hearing regarding the propriety of a "no code" order the judge heard expert testimony from this child's pediatric-cardiologist. The physician, in agreement with all other staff members at NEMC, recommended that a "no code" order be entered on the child's chart. This decision was based upon factors such as the child's terminal illness, the futility, pain, and intrusiveness of heroic medical efforts, and sound medical and ethical judgment. There was no medical evidence to the contrary. The court did not err in concluding that if this child "had the mental capacity to understand the incurable nature of his illness, the terminal prognosis, the nature and purpose of a 'full code' order and the virtual certainty of its limited and temporary effect, he would choose to forego its use."

Approximately two weeks later, physicians from NEMC appeared before the same Juvenile Court judge requesting that the "no code" order be lifted. Although the child's underlying cardiac problems and over-all chances of survival beyond one year were the same, the absence of an unrelated bacterial infection improved the child's immediate condition to the extent that the physicians recommended the child's discharge to a foster home. In a foster home, the child could receive affection, attention, and love for the remaining days of his life. Also, although his chances for survival would be greater in a hospital, an infection contracted in a hospital setting would be more difficult to treat than one contracted in a home. The child was thus discharged from NEMC on the basis of the physicians' opinion that such would be in his best interest.

The court found, based on expert testimony, that discharge from NEMC was equivalent to a "no code" order. If the child were in his foster home and developed cardiac arrest he would be likely to die because the foster parents would

be unable to get the child to a hospital in time to resuscitate him. The court concluded that the child would choose to be discharged from the hospital to his foster home for the short time he had to live and to have the "no code" order remain in effect. This decision was amply supported by the evidence and we find no error.

Last, we note that, in our view, the judge acted promptly, carefully, and diligently in hearing all the evidence put before him. He has continued to indicate his continued availability to reconsider the matter in the light of new evidence or change in the child's condition. We have previously affirmed his power to issue such further orders as may be appropriate.

We conclude that the Juvenile Court acted appropriately in this case in exercising its jurisdiction and substituting judgment on behalf of this minor child.