603 N.E.2d 1171 (1992)
236 Ill. App.3d 594
177 Ill.Dec. 797
In re C.A., a Minor (Thomas E. Holum, Guardian Ad litem for C.A., Plaintiff-Appellant,
v.
Gary T. Morgan, Guardian for C.A., and The People of the State of Illinois, Defendants-Appellees).
No. 1-91-3091.
Appellate Court of Illinois, First District, Fourth Division.
October 15, 1992.
*1172 Thomas E. Holum guardian ad litem, Chicago, for plaintiff-appellant.
Roland Burris, Atty. Gen., James I. Marcus and Michael Fries, Sp. Asst. Attys. Gen., Jack O'Malley, State's Atty., (Renee Goldfarb, Donald Devlin, Elizabeth Reidy & Theresa Maganzini, Asst. State's Attys., & Susan S. Wigoda, Sp. Asst. State's Atty., of counsel), Chicago, for defendants-appellees.
Justice LINN delivered the opinion of the court:
C.A. was born several weeks prematurely, suffering from severe cocaine withdrawal and a myriad of complications that resulted in her being placed on an apnea cardiac monitor and ventilator. She was *1173 also found to have a large amount of HIV (Human Immunodeficiency Virus) in her blood. Because of her condition and the inability of her 19-year-old parents to care for her, the Illinois Department of Children and Family Services ("DCFS") filed a petition for adjudication of wardship in the juvenile division of the circuit court of Cook County. Thomas E. Holum was appointed guardian ad litem ("GAL"). Gary T. Morgan, the guardianship administrator of the DCFS, was appointed temporary custodian with the right to consent to medical treatment. Subsequently, the court entered a dispositional order vacating Morgan's temporary custodianship and appointing him guardian of the child.
The DCFS filed a supplemental petition in the juvenile court for instructions and for authority to consent to the entry of a do not resuscitate ("DNR") order on C.A.'s medical charts. The petition alleged that C.A.'s medical condition had deteriorated and that the hospital had obtained from C.A.'s parents a letter stating their desire that their daughter receive treatment to alleviate her pain or improve her life, but not to resuscitate her if she stopped breathing or if her heart stopped.
After a hearing, the juvenile court granted the petition and entered an order finding it to be "in the best interest of the minor" for the DCFS "to act in accordance with the recommendations of the treating physicians" of the patient. That order was stayed pending this appeal.
The GAL raises a number of challenges to the trial court's order. One is directed at the court's authority to enter the order under the Juvenile Court Act of 1987 (Ill. Rev.Stat.1991, ch. 37, par. 801-1 et seq.); another challenges the guardian's standing to petition for consent to withhold medical treatment; and a third questions whether the evidentiary showing in this case was sufficient to justify entry of a DNR order. Finally, the GAL challenges the constitutionality of the newly enacted Health Care Surrogate Act (Ill.Rev.Stat.1991, ch. 110½ par. 851-1 et seq.), legislation that became effective ten days after the entry of the trial court's order in this case.

BACKGROUND
The baby was born on October 23, 1990. She was small for her gestational age (fifth percentile) and was experiencing interventricular hemorrhaging, which means that the blood vessels in her brain were quite weak and subject to spontaneous rupture. She required the use of a cardiac monitor and mechanical ventilation for weeks after her birth.
C.A.'s mother, herself a ward of the court, was 19 years old with a juvenile record and a history of drug abuse. She had no regular residence and lived on the street. She had given birth to another child, Jonathon, by a different father, and that child also had been adjudged a ward of the court and placed in foster care. C.A.'s mother had not seen or visited Jonathon for over a year. C.A.'s father, an American Indian, was also 19 years old. He, too, had a drug problem. The two youths were not married and did not have a stable relationship.
The juvenile court found, by order of March 21, 1991, that the minor's parents were unwilling and unable to care for her and that it was in C.A.'s best interests to be made a ward of the court with Gary T. Morgan acting as her guardian.
On July 10, 1991, the DCFS filed a supplemental petition for instructions, alleging that C.A.'s medical condition had deteriorated and that the hospital in which she was being treated had requested and received from C.A.'s parents permission to place a DNR order in her medical charts. Although the DCFS concurred with the hospital's request, the agency sought the court's instruction as to its authority to consent to the DNR order in accordance with the wishes of the biological parents and doctors.
On July 11, a hearing on this petition began. Dr. Rebecca Simmons, C.A.'s attending physician, testified as to her credentials and the court found her qualified in the fields of pediatrics and neonatalogy. Dr. Simmons testified that the baby's diagnosis was "HIV, status post-necrotizing, and prematurity." "Necrotizing" is an infection of the bowel that results in the death *1174 of tissue and requires removal of part of the bowel. In her opinion, C.A.'s prognosis was "terminal," meaning that her death would most likely result within the next year, based on statistics.
C.A. was being given two drugs "for her AIDS" and she had been given a "central line for intravenous feeding." She had a tracheostomy. The doctor testified that the appropriate treatment for C.A. at the time was to "continue her HIV medications; to continue her central line feedings, intravenous feeding, and to continue to carry her tracheostomy." Dr. Simmons testified that in her professional opinion, it would not be in C.A.'s best interest for doctors to attempt resuscitation if her heart stopped beating or she ceased breathing. The witness testified that it would be in the infant's best interests, however, to continue the medication for HIV and to keep the central line and tracheostomy in place.
Dr. Simmons testified that the baby was fully conscious and aware of her surroundings. She interacted with others socially, but not "normally." At eight months, she was "very developmentally delayed," functioning neurologically like a four-month-old child. C.A.'s HIV would severely impair her in the future. Asked if death was "imminent," Dr. Simmons stated that it" could be imminent. It could be very unexpected." The infant had already suffered a cessation of breathing and heart functioning in the past and she was, in the witness's opinion"at high risk for sudden death."
The hospital had resuscitated C.A. by using CPR and had inserted a catheter into her heart. Dr. Simmons said that the child was uncomfortable and cried a lot. She was incapable of eating by herself at the time of the hearing and her condition had worsened because of the tracheostomy. C.A. had been feeding normally until the necrotizing bowel problem. Since then she had had two surgeries. At the time of the hearing, she was able to defecate normally.
Dr. Simmons gave her opinion, within a reasonable degree of medical certainty, that C.A. would not improve to have a normal life. She also stated that C.A. was under sedation for her comfort and it would be in her best interest not to resuscitate her if her heart or breathing stopped. It would be in her best interest to stop her suffering. She was in complete agreement with the parents wishes, as memorialized in their letter.
Further questioning involved C.A.'s HIV infection. Dr. Simmons said that the doctors believed that the HIV contributed to the necrotizing of the bowel. C.A. could not eat properly at the time and continued to vomit up her food.
The hearing was continued to September 13 so that a second physician's opinion could be obtained.
Elizabeth Gath, an attending physician in the departments of internal medicine and pediatrics at Cook County Hospital, testified that she is associate director of the Women and Children with AIDS program. She is licensed to practice medicine in three States. The court found her qualified as an expert witness.
Dr. Gath reviewed C.A.'s medical records and charts but did not examine the infant herself. At the time of Dr. Gath's testimony, C.A. was 11 months old. After stating the diagnoses of the child, Dr. Gath was asked about the "profoundly compromised" state of C.A.'s immune system, due to the large amount of the virus in her blood. Dr. Gath explained that the virus ultimately causes the syndrome known as acquired immunodeficiency (AIDS). One of the measures used to test the immune system is a count of the T-cells, a subset of a type of white blood cell known as a lymphocyte. The T-4 helper cells are the ones injured by the virus. Normal children have a T-4 cell count of about 3,000. C.A.'s count was only 300. This places her at risk for multiple infections and complications. At the time of the hearing, C.A. was being treated with AZT, which does not cure HIV but prolongs life. She was also being given a medication to help fight a type of pneumonia that children with HIV are particularly susceptible to getting.
Dr. Gath testified that she was aware of two incidents of resuscitation that were *1175 necessary, one at C.A.'s birth and one on March 1st of 1991. The first episode was a result of the premature birth and the second was a spontaneous cessation of breathing, which is not uncommon in premature infants. The doctor was in agreement with the treatments and medications being administered. She said it was significant that C.A. was diagnosed as HIV-infected prior to her first birthday because it indicates the more severe form of illness. Statistically, a child who exhibits this condition will be dead by her third or fourth birthday.
Dr. Gath was asked whether she was in agreement with the potential placement of a DNR order in C.A.'s charts. She said that the parents' written wishes seemed an appropriate indication of parental concern. She also said she was concerned that "we may be doing the right thing, do not resuscitate, perhaps for the wrong reason," although she did not explain that remark. The witness did note that the child had multiple problems but that they seemed to be "quiescent" at the moment. In other words, C.A. was feeding and was not infected with anything at the time. The problems C.A. had, however, were" longstanding and ongoing. She's suffered two interventricular hemorrhages. She is neurodevelopmentally delayed, either because of the hemorrhages or because of the hypoxia as a result of the two resuscitative efforts." "Hypoxia" is low oxygen in the brain which would cause brain damage. In response to a later question from the court asking whether the hypoxia was caused by the resuscitation, the witness answered in the negative and explained that breathing problems and the resulting loss of oxygen in the brain could have been caused by C.A.'s prematurity.
Dr. Gath further testified that C.A. was stabilized at the time but that she would require a resuscitation in the future and at that point "it would seem prudent if the family and the attending physician at that time feels that this child could not be resuscitated from it, that it would seem prudent not to have a resuscitative order."
"Do not resuscitate" means do not give cardiac compression or intubation. "Intubation" means placing a tube directly into the lungs and have a machine breathe for the child. Other "aggressive measures" that could be used to revive someone include vasopressors, which are medicines that would keep blood pressure elevated if the blood pressure dropped precipitously.
C.A. continued to be fed through a tube and could not swallow properly. She continued to vomit. There was no current evidence of necrotizing of the bowel. Her T-cell count would not have been raised from the HIV medications. The virus suppresses the T-4 helper cells and gets "into all systems of the body, including the bone marrow, which can then cause suppression of all cell lines, platelets, white cells, red cells. It can cause profound anemia. It can cause profound bleeding disorders. It can cause susceptibility to multiple types of infections, infections that persons with a normal immune response would not be susceptible to."
Dr. Gath was aware of approximately 3,000 children in the nation whose diagnosis of AIDS-defining illnesses were reported since 1982. Of those, a significant number were found to be HIV-infected by their first or second birthday, and of that group, 80 percent died by their third birthday.
Dr. Gath testified that C.A. was not in a comatose or vegetative state and, although she had a terminal illness, her death was not necessarily "imminent" in the sense of happening within a matter of days or weeks, at least as far as could be determined from the medical records. According to a letter from a physician regarding the infant's neurological deficits, C.A. was neurodevelopmentally two months old when she was chronologically eleven months old. Finally, Dr. Gath testified that the child was suffering because of the tube down her esophagus and the vomiting.
The final witness was Randi Gurian, a social worker with the DCFS, assigned to the neonatal intensive care unit at Children's Memorial Hospital. She had been involved in the case since the birth of C.A. and knew both parents, especially the *1176 mother. Gurian testified that she typed the letter that the parents dictated to her following counseling as to C.A.'s condition and prognosis. At the time the letter was written, March 21, 1991, the baby had been critically ill for approximately three weeks. The parents came to her office asking to talk to Gurian about what would happen to their daughter. They continuously stated that they wanted everything done for her and hoped she would recover. The parents asked if the doctors thought C.A. would eventually die of AIDS. The mother said she did not want C.A. to suffer and that everything should be done to increase the baby's comfort. The father agreed that there should be no extraordinary measures to resuscitate C.A. and that it had taken the baby's mother a longer time to reach that conclusion. Gurian testified that she then contacted the primary nurse and attending physicians and after reviewing the situation the doctors asked if the parents wanted a DNR order in the event the child's heart or breathing stopped. The parents asked Gurian to help them write the letter, which they dictated and signed.
Afterwards, Gurian saw the mother on several occasions but not the father. Neither parent had communicated any desire to withdraw their letter requesting the DNR order. The mother reiterated that she wanted her daughter to live but that if her heart stopped, she did not want anyone to pound on her and did not want any more machines.
At the time of the hearing, C.A. was in a specialized foster home.
During closing remarks, the attorney for the DCFS emphasized that he was "not asking the Court today to issue an order to do not resuscitate on this minor. What the department is asking is that it is in the bestthat this Court find that it is in the best interests of the minor and that the department will do no harm if we give our authorization to the treating physician to issue a do not resuscitate order. This will be at such time as the treating physician feels that it is necessary and proper."
The GAL stated in response that he relied primarily on the Illinois Supreme Court cases of In re Estate of Longeway (1989), 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 and In re Estate of Greenspan (1990), 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194. According to the GAL, "under those cases * * * the DCFS request is premature in this case." The GAL argued that C.A. was not in a coma or vegetative state, her death was not imminent, and she was not terminally ill. Also, under the "substituted judgement" test set out in the Supreme Court cases, C.A. could not have expressed any preference as to the termination of medical treatment because she is a minor.
The court took the matter under advisement and issued its ruling on September 16, 1991. On that date the court found that after reviewing all of the evidence and cases, it was in the "best interest of the minor for the Illinois Department of Children and Family Services to act in accordance with the recommendations of the treating physician at the [hospital] and it is so ordered." At the request of the GAL, the court stayed the order and we have also granted a stay pending appeal.

OPINION

I.
During oral argument on appeal the GAL focused on the sufficiency of the evidence and the applicability of the Surrogate Health Care Act to this case. (Ill.Rev.Stat. 1991, ch. 110½, par. 851-1 et seq. (eff. Sept. 26, 1991).) The GAL stopped short of expressly conceding the first two issues he raised in his brief, which concern the juvenile court's jurisdiction and the court-appointed guardian's authority to seek approval of a DNR order for the ward; however, the GAL admitted that the juvenile court could approve such an order under certain circumstances. Apparently, the GAL's chief concern was that by permitting the guardian to consent to a DNR order in this case, the juvenile court failed to apply appropriate standards that would safeguard children in C.A.'s position. The GAL also charged that there was a "total failure of evidence" to support the need for the DNR order itself.
*1177 In contrast, the DCFS argued that the case does not involve the sufficiency of the evidence, which was uncontested, but instead involves the propriety of the court's grant of authority to the guardian to consent to the entry of a DNR order at such time as the treating physicians believe it is a necessary and proper order, given the medical condition of the child. The DCFS also asserted that the new Surrogate Health Care Act does not apply, but even if it did its aims were fulfilled in this case.
In defining the circumstances under which life-sustaining medical treatments may be withheld from a patient, the courts assume a difficult role. Few other intersections between the law and medicine involve issues that so strongly implicate moral, religious, or philosophical beliefs. This court must carefully review legal precedent, to the extent it exists, and determine whether the trial court in this case exceeded its authority, abused its discretion, or otherwise entered an improper order. If not, we must affirm.
There is little doubt that if this case involved an otherwise healthy ward of the court who needed a blood transfusion or organ transplant, the guardian would have consented, the court would have approved, and no one would have appealed from the determination. If, however, that same child were the offspring of Jehovah's Witnesses, who objected to the child's receiving blood transfusions, a more difficult case would be presented. (See People ex. rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769 (Despite parents' religious objections infant would receive blood transfusions to save her life).) If the child were 17 years old instead of an infant, and firmly expressed the desire to follow her religious beliefs to the exclusion of the life-saving operation, the outcome under Illinois law would be to respect the mature minor's decision. In re E.G. (1989), 133 Ill.2d 98, 139 Ill.Dec. 810, 549 N.E.2d 322.
The first example involves a consensus of opinion that organ transplants to save lives are necessary and desirable. The second and third examples illustrate what happens when a minority religious viewpoint clashes with societal norms and the medical establishment. The ultimate issue, then, is who is in the best position to decide (and who gets to decide who will decide). See also Curran v. Bosze (1990), 141 Ill.2d 473, 153 Ill.Dec. 213, 566 N.E.2d 1319 (In light of mother's opposition, court would not find it in the best interests of 3½ year-old twins to undergo bone marrow harvesting to possibly save life of their half-brother).

A.
The Common Law Basis For Discontinuance of Life-Sustaining Treatment
Traditionally, the law has preserved a patient's right to self-determination, even when he decides against life-sustaining medical treatment. (See In re Estate of Longeway (1989), 133 Ill.2d 33, 44, 139 Ill.Dec. 780, 549 N.E.2d 292, 297, (Common law right to consent to or refuse medical treatmentwhich is rooted in "sacred" right to "personal inviolability"provides the legal authority for a patient to refuse treatment, including artificial nutrition and hydration); see also Corlett v. Caserta (1990), 204 Ill.App.3d 403, 412, 149 Ill.Dec. 793, 562 N.E.2d 257 (Patient's fundamental right to consent to medical treatment is found in the Federal Constitution and Illinois' common law).) When the patient is not competent, or his desires are not ascertainable, other factors must be considered before life-sustaining treatments are discontinued. (See, e.g., In re Estate of Greenspan (1990), 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194 (The guardian of an incompetent has the duty to act in the ward's bests interests, but if the patient's previously expressed desire as to medical treatment conflicts with the guardian's determination of the ward's best interests, court will apply the "substituted judgment" test, which requires clear and convincing evidence of the patient's intent); see also Guidelines For State Court Decision Making In Authorizing Or Withholding Life Sustaining Medical Treatment (1991), printed by West Publishing Company on behalf of the National Center For State Courts ("LSMT guidelines")).) Before we reach specific guidelines that legislatures *1178 and courts have fashioned to handle such situations, we address the juvenile court's statutory jurisdiction to enter orders affecting a ward's medical treatment, including the entry of a DNR order.

B.
The Juvenile Court Guardian's Authority to Consent to DNR Order
What is the primary issue in this case? What are the standards for deciding when a DNR order may be placed on a ward's charts when the ward's interests are represented by a court-appointed guardian under the Juvenile Court Act? To answer these questions we look first to the court's power under that Act.
Section 2-11 permits the court during temporary custody to approve "medical, dental, or surgical procedures if such procedures are necessary to safeguard the minor's life or health." Section 2-27(1)(d), which applies to the legally appointed custodian's or guardian's power after appointment, allows him to consent to "major medical and surgical treatment." (Ill.Rev.Stat. 1991, ch. 37, pars. 802-11, 802-27(1)(d).) In our view, these provisions support the guardian's general standing to petition the court for authority to consent to a medical judgment made by the ward's treating physicians, even when that judgment is to discontinue life-sustaining medical treatment. The court is charged with ruling on all matters presented to it regarding the welfare of the child. Moreover, the Juvenile Court Act provides for court review of matters affecting the ward on a regular basis. For example, the guardian is required, periodically, to file reports in the court to ensure that case plans involving the wards are being implemented. See Ill. Rev.Stat.1991, ch. 37, par. 802-28(2).
In Illinois, no court of review has addressed whether the Juvenile Court Act provides judges with authority to consent to the placement of a DNR order on a minor ward's medical chart. Other jurisdictions have accepted the authority of a juvenile court to approve such an order, however. In Custody of a Minor (1982), 385 Mass. 697, 434 N.E.2d 601, the child was suffering from a terminal cardiac condition with no known cure and was on a respirator. The hospital sought entry of a DNR order and the Massachusetts trial court found that it would be in the child's best interest not to be resuscitated if he went into cardiac or respiratory arrest. On appeal, the Supreme Judicial Court affirmed, holding that once a child in need of care and protection is committed to the Department of Social Services, the juvenile court has authority to make medical care decisions, including the one in question. See also In re Guardianship of Hamlin (1984), 102 Wash.2d 810, 689 P.2d 1372 (Court held that court-appointed guardian of ward with mental age of one year had statutory authority to consent to termination of life support systems, even without court intervention, but that any interested party could file petition in court and court would intervene in cases of conflict between hospital, prognosis committee, attending physicians, or guardian); In re L.H.R. (1984), 253 Ga. 439, 321 S.E.2d 716 (Subject to certain safeguards, parents or legal guardian of terminally ill infant or incompetent adult in comatose state could consent to removal of life support without prior judicial intervention). See also Annot., Judicial Power To Order Discontinuance of Life-Sustaining Treatment, (1986), 48 A.L.R.4th 67.
Our juvenile court is charged with implementing its legislative mandate to care for those minors found to be in need of the State's protection. We believe that the court acted properly in hearing the petition and in concluding that C.A.'s guardian could consent to the placement of a DNR order on her charts under certain conditions.[1]

*1179 II.
The more difficult issue is whether the court exercised its power properly, given the evidence presented. The GAL focuses his arguments on this aspect of the case, urging us to reverse the order as being entered without legal standards or sufficient evidence. He argues that the Illinois Supreme Court in Longeway and Greenspan set forth governing standards that were not met in this case. Specifically, he asserts that those cases require clear and convincing evidence that a patient's death be "imminent", which he argues was not established here. He further contends that the juvenile court in this case improperly used the "best interests" standard in granting consent rather than the "substituted judgment" test of Longeway and Greenspan.
Which Standard Applies In Cases of Minor Wards?
Both Longeway and Greenspan involved adult patients whose decision-making capacity was non existent at the time their guardians sought the cessation of life-sustaining medical treatments. Both, however, had clearly expressed their desire (while still competent) that they not be kept alive artificially or allowed to linger. Both patients were in their seventies and would not recover from their disabilities, but were being kept alive by artificial nutrition and hydration. Neither had executed a living will (Ill.Rev.Stat.1987, ch. 110½ par. 701 et seq.) or a health care power of attorney (Ill.Rev.Stat.1987, ch. 110½ par. 804-1 et seq.).[2]
In Longeway the court borrowed the definition of terminal illness from the Illinois Living Will Act and held that a terminal condition is one in which (1) death is imminent and (2) death-delaying procedures serve only to prolong the dying process. (133 Ill.2d 1, at 47, 139 Ill.Dec. 780, 549 N.E.2d 292.) In such a case, the withdrawal of feeding and hydration tubes would be permitted. In Greenspan, the court commented that the "imminence" of a patient's death "must be judged as if the death-delaying procedures were absent." (137 Ill.2d at 21, 146 Ill.Dec. 860, 558 N.E.2d 1194.) Under that reasoning, the court held that Mr. Greenspan's death would occur within a week after withdrawal of the feeding tube and was thus "imminent," or near at hand. Finally, to safeguard the patient pending any legislative modification of the common law, Greenspan held that a surrogate decision-maker can exercise the patient's right to forego artificial hydration and nutrition only if, in addition to the terminal illness of the patient, "the incompetent has been diagnosed as irreversibly comatose or in a persistently vegetative state"; the incompetent's treating doctor and two other consulting doctors have concurred in the diagnosis; "the incompetent's right outweighs any interest of the State, as it normally does"; it is ascertained what the incompetent presumably would have decided if competent under the circumstances; and "a court enters an order allowing the surrogate to exercise the incompetent's right to refuse the treatment." 137 Ill.2d at 16, 146 Ill.Dec. at 867, 558 N.E.2d at 1201.
The GAL, in the pending case, argues that C.A.'s condition was not terminal under the Greenspan definition and that she was not in a coma or persistent vegetative state. He further argues that since Longeway and Greenspan require clear and convincing evidence that the patient would want the treatment discontinued, under the substituted judgment test, the trial court in this case lacked the power to apply the best interests standard. Without elaboration, *1180 the GAL states that it "is clear" that a best interests standard "is not susceptible of proof by clear and convincing evidence."
We reject the argument that the trial court was bound to apply the substituted judgment test when almost by definition an infant has no articulable judgment to be substituted. Because wards of the court are not in the care of their biological parents, representatives of the State step in to act in parens patriae. Section 2-22 of the Act expressly requires the trial court to adhere to the "best interests of the minor and the public", in dispositional hearings concerning wardship. (Ill.Rev.Stat. 1991, ch. 37, par. 802-22.) In practice, the determination of whether a proposed course of action is in actually in the child's best interests may be subject to differing opinions. See People ex. rel. Wallace v. Labrenz (1952), 411 Ill. 618, 104 N.E.2d 769 (right of child to life-sustaining transfusions prevails over religious views of parents); In re Quinlan (1976), 70 N.J. 10, 355 A.2d 647 (After much anguish, and with support of church, patient's father sought to be appointed guardian for comatose daughter for withdrawal of artificial respirator (but not feeding tubes)); Cruzan v. Director, Missouri Department of Health (1990), 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (Patient's parents sought withdrawal of comatose daughter's feeding tubes because of their belief she would want discontinuance of life-support); see also Barber v. Superior Court (1983), 147 Cal.App.3d 1006, 1018-19, 195 Cal.Rptr. 484, 491 (In dismissing murder prosecution against doctors who discontinued a patient's life-support system at family's request, court suggested that patient's best interests be determined by balancing the burdens generated by a medical intervention against its benefits).
As the Greenspan court noted, although a public guardian must act in the best interests of a ward, such standard cannot prevent him from seeking termination of artificial feeding systems in accordance with his ward's clearly expressed desires. In other words, the substituted judgment test is to be applied in the case of once-competent adult patients whose desire can be determined; it honors the patient's right to choose, not someone else's decision that it would be in the best interests of the patient to continue to receive life-sustaining treatments. The patient's right to control his treatment prevails over contrary opinions of surrogates and caregivers.
The substituted judgment test, however, is of limited relevance in the case of immature minors. If anyone's judgment is being substituted it is that of the parents or some other person with a close interest in the child's welfare. (See In re L.H.R. (1984), 253 Ga. 439, 321 S.E.2d 716 (recognizing that substituted judgment test is inapplicable to cases involving infants); cf. In re Guardianship of Barry (Fla.App. 1984), 445 So.2d 365 (using substituted judgment of parents and doctors and requiring clear and convincing evidence of terminally ill infant's medical condition before authorizing removal of life-support system).) The Health Care Surrogate Act expressly recognizes that the best interests standard, rather than substituted judgment, applies in the case of incompetents, including minors, whose consent or desire cannot be discerned. See Ill.Rev.Stat.1991, ch. 110½, par. 851-20(b)(1).
Without a doubt, if C.A.'s parents were themselves competent adults whose baby was not a ward of the court, and they agreed with or consented to the doctors' recommendation of a DNR order, that decision would have remained in the private domain and the court would not have become involved. As primary caregivers, parents or other close family members ordinarily are the ones charged with making the difficult determination of what is in a terminally ill child's best interests. The legislature recognized this in providing statutory authorization for private decision making under the Health Care Surrogate Act. See Ill.Rev.Stat. 1991, ch. 110½ par. 851-5(a) ("* * * Uncertainty and lack of clarity in the law concerning the making of private decisions to forgo life-sustaining treatment, without judicial involvement, causes unnecessary emotional distress to the individuals involved and unduly impedes *1181 upon the individual right to forgo life-sustaining treatment").
We conclude that the court properly used the best interests of the child standard in ruling that the guardian had authority to consent to the entry of the DNR at such time as the treating doctors agreed it was medically appropriate. The GAL's reliance on Longeway and Greenspan to strike down the court's order in this case avoids the specific factual context before us and the precise issues posed. The supreme court in both cases confirmed that incompetent patients have a common law right to refuse life-sustaining treatment through a surrogate. In both cases, the surrogates were close family members acting as guardians and attempting to effectuate the will of the patient, as expressed by his or her prior statements. Both involved removal of existing and continuous treatments that kept the comatose patients artificially alive. In the pending case, however, the surrogate is a court-appointed guardian of a minor ward who cannot express a judgment on the issue of her resuscitation. C.A.'s guardian does not seek the discontinuance of nutrition or medication, but instead requests permission to act in accordance with the parents' and doctors' decision that, given C.A.'s terminal and incurable condition, not to mention discomfort, no measures to restart her heart or breathing should be undertaken if her cardiac and respiratory systems fail on their own. Like the elderly patients in Greenspan and Longeway, however, C.A. has no true awareness of her condition, and her age and impaired neurological development means she will remain unable to appreciate her situation. We conclude that the best interests of the child standard, rather than substituted judgment, is the proper way to evaluate C.A.'s condition.

The Evidence of C.A.'s Medical Condition
The medical evidence in this case was not disputed. The baby suffered from severe and incurable conditions, including the HIV infection and major neurological impairment. She needed intravenous feedings and had undergone two surgeries to her bowels. Other medical interventions to prolong her life included a tracheostomy, or tube in her throat, and a catheter in her heart. C.A.'s pain may not be quantifiable, but Dr. Gath testified that she was suffering, vomiting up her food, and crying a lot. The GAL does not dispute these facts, and while he makes an argument denying the "imminence" of C.A.'s death and the "terminal" nature of her condition, ultimately the GAL's position rests on the contention that no level of evidence can sustain the entry of a DNR order on an infant's medical charts because it is impossible to ascertain the infant's wishes. Under the substituted judgment tests of Greenspan and Longeway, therefore, the GAL argues that the trial court's order in this case must be found to be unsupportable by any evidence.
We reject this reasoning. If the argument is correct, the juvenile court judge in this case would have had to abandon C.A., in a sense, and simply dismiss the petition. That would leave C.A. in a worse position than a baby whose parents decide, with the doctors, that a particular course of treatment is better than another.
Whenever a court having jurisdiction over a justiciable controversy is faced with a novel legal issue or case of first impression, that court must exercise its judgment in accordance with traditional jurisprudence. Here, the court conducted an evidentiary hearing at which several witnesses testified. The GAL was given a full and fair opportunity to present all matters he deemed were significant on the issues. We do not agree with his assumption that unless the facts of the pending case fit exactly within Greenspan or Longeway, we must vacate the trial court's order. Here, the treating physician gave her opinion that it was in the best interests of C.A. to have the DNR order available; a second physician agreed that it was "prudent"; the infant's parents expressed their wishes in writing to the same effect; the social worker on the case corroborated the parents' decision that the child should not suffer and that given her prognosis it was in her interests not to be revived. We believe that the medical evidence and opinion as to her prognosis can fairly be viewed as clear and convincing.
*1182 The GAL did not, in fact, offer contrary evidence. Instead, the GAL challenges the legal conclusion that C.A.'s condition was terminal, her death imminent.
As to the terminal nature of her illness, both doctors Simmons and Gath agreed that the child was in fact under a death sentence because of her HIV infection and profoundly compromised immune system. The GAL nevertheless argues that the evidence on this point was inadequate because the witnesses based their diagnosis on statistical analysis of other cases involving HIV-positive children, 80% of whom died by their third or fourth birthday. The GAL also uses the fact that such children may live beyond their fourth birthday as support for his contention that C.A.'s death is not imminent at this time.
We wish to avoid overly technical constructions of "terminal" and "imminent" because those terms must be considered in particular factual contexts. At the time the DNR order was initially sought in the pending case, C.A. was critically ill. Her condition at that time could well have been viewed as one in which death was imminent and resuscitative procedures would serve only to prolong the dying process. More to the point, the guardian was not seeking the immediate entry of a DNR order on C.A.'s charts at the time of the court's ruling. Rather, he sought a finding that he was the proper surrogate to consult with the treating physicians at such time as they believed the DNR order was necessary and proper.
During oral argument before this court the guardian stated that DNR orders are constantly reviewed by medical personnel and are not necessarily permanent. Therefore, to grant the guardian authority to consent to a DNR order in the future, the trial court was not required to hold that C.A.'s death was imminent at the time the court ruled on the petition. The evidence did establish, however, that an infant who is HIV-infected from birth is expected to die from the complications of AIDS within a few years. Certainly, such a condition may be viewed as incurable and fatal, and, in the ordinary sense, terminal. The evidence at the hearing, in our opinion, established the gravity of C.A.'s condition and her nonexistent prognosis for even a semblance of normal childhood. Confined to bed, her painfully foreshortened life is attended by tubes, machines, catheters, and specialized care facilitiesnot playmates, toys, or trips to the zoo.
The witnesses who testified at trial all agreed that the DNR order was the proper course at such time as the child's condition destabilized in the future and the medical decision would be made that resuscitative measures would not be beneficial. At that time, presumably her death would be considered "imminent" under the Greenspan definition, "judged as if the death-delaying procedures were absent." (137 Ill.2d 1, 21, 146 Ill.Dec. 860, 558 N.E.2d 1194.) Dr. Gath was the only witness expressing some ambivalence, in answering questions regarding the terminal nature of the disease, saying "we all have terminal illnesses known as life, itself". She agreed, however, that the child was suffering, had serious and ongoing disabilities, and that in the future, when C.A. needs a resuscitation, a DNR would be "prudent."
Finally, then, we conclude that the trial court did not err in granting to C.A.'s guardian the authority to consent to the entry of a DNR order in her medical charts in accordance with the treating doctor's recommendations, which, in turn, were based on her medical condition and prognosis. We read the court's order as affirming the guardian's authority to act as C.A.'s surrogate, to implement a decision that C.A.'s guardian, her doctors, and her parents concurred in as being in the child's best interests. In our view, the medical evidence presented was sufficient to enable the court to determine that a DNR order should be available for this patient. The court neither abdicated its responsibilities nor exceeded its authority.
We stress that we are not attempting to resolve, for all cases, when and in what circumstances a guardian appointed under the Juvenile Court Act may seek (or not seek) judicial intervention before consenting to placement of a DNR order on a *1183 ward's medical charts. Some of the evidence in this case indicates that C.A.'s prematurity was the likely reason she stopped breathing at birth and on the subsequent occasion. We certainly do not imply that premature infants should not be resuscitated or otherwise treated, simply because of their prematurity. We live in an age when medical technology can save premature babies who, a decade or two earlier, would almost certainly have died at birth. C.A., tragically, suffers from a devastating, deadly condition that current medical technology cannot cure. We are limiting our opinion to its facts, with the caveat that in cases like this onewhere the patient's wishes are not available and the court is involvedsomeone has to decide. Although it may be argued that when the patient's desires cannot be determined, life-sustaining medical treatments should be instituted or maintained, we are of the belief that such an outcome is as much a decision, by default, as any other. (See LSMT guidelines, at 66.)

III.
We have alluded throughout this opinion to the Health Care Surrogate Act, which became effective on September 26, 1991, days after the entry of the order in this case. The GAL requests us to not only find that it applies to this case and was not fulfilled, but also to declare the Act unconstitutional for lacking due process and equal protection safeguards. We decline to reach constitutional issues that are not necessary to our ruling nor squarely before us, however. Therefore, our brief discussion of the new Act is limited to acknowledging that the legislature has stepped into this area and enacted a statutory framework to guide interested parties in the future. See Ill.Rev.Stat. 1991, ch. 110½ par. 851-5(a) ("The legislature recognizes that all persons have a fundamental right to make decisions relating to their own medical treatment * * * [and lack] of decisional capacity, alone, should not prevent decisions to forgo life-sustaining treatment from being made on behalf of persons who lack decisional capacity * * *.").
The Health Care Surrogate Act allows an individual chosen from among a statutory order of persons (including the patient's guardian, family members, or close friends) to decide, subject to certain conditions, whether to initiate or continue life-sustaining medical treatments when the patient cannot speak for himself. The Act adopts the substituted judgment test to be used when the patient had expressed views on the subject before becoming incompetent. When the patient's views are not ascertainable, however, the Act provides for application of the best interests of the patient standard. (Ill.Rev.Stat.1991, ch. 110½, par. 851-20(b)(1).)
The Act sets forth three qualifying conditions, which trigger the surrogate's authority to act when one or more of the conditions is certified to exist by the attending physician and at least one other qualified physician. The first condition defines "terminal condition" as meaning "an illness or injury for which there is no reasonable prospect of cure or recovery, death is imminent, and the application of life-sustaining treatment would only prolong the dying process." (Ill.Rev.Stat.1991, ch. 110½ par. 851-10.) This is similar to the Greenspan definition.
The second, alternate condition is the "permanent unconsciousness" element found in the coma or persistent vegetative state, meaning in essence that the patient is unaware of "self and environment," incapable of "purposeful action [or] social interaction" and the initiation or continuation of life-sustaining treatment in light of the medical condition provides "only minor medical benefit." Ill.Rev.Stat.1991, ch. 110½ par. 851-10.
The third, alternative qualifying condition is an "incurable or irreversible condition" for which there is not a "reasonable prospect of cure or recovery." It is a condition "that ultimately will cause the patient's death" even with the life-sustaining treatment; "imposes severe pain or otherwise imposes an inhumane burden on the patient;" and is a condition for which the continuation of life-sustaining treatment in light of the patient's medical condition *1184 provides only minimum medical benefits. Ill.Rev.Stat.1991, ch. 110½ par. 851-10.
The GAL challenges the new Act on the grounds that it does not provide for automatic judicial review of all matters affecting life-sustaining medical treatments. At the same time, he argues that the trial court did not follow the requirements of the new Act, which was not then in effect. The juvenile court did conduct an evidentiary hearing to determine what would be in the best interests of the child, however, which presumably would not have been required had the parties proceeded under the Surrogate Health Care Act. We find the GAL's position unworkable, as it apparently argues for greater restrictions on a surrogate's ability to consent to the termination of life-sustaining treatments than either the courts or the legislature has found appropriate.
As noted, we will not address the constitutionality of the new Act. Nor do we express an opinion as to how the Act may operate in conjunction with the Juvenile Court Act when the rights of minor wards are affected. We do not think the result in this case is inconsistent, however, with one that could have been reached under the new Act.
As a note of caution, we remind parties and lawyers involved in surrogate health care decisions that time is often a major factor. In the pending case, our opinion affirms the guardian's right to consent to the DNR in the future, in consultation with the attending physicians, without the further involvement of the court. Unfortunately, the proceedings below and the appeals process has already added months of uncertainty to an unfortunate situation. In some cases, because of the emergency nature of these types of decisions, courts may not be able to act fast enough. That is surely one of the concerns the legislature considered in providing for such decisions to be made without judicial intervention whenever possible. When the court is involved, however, it can act only within its traditional role. From the common law right of a patient's informed consent to statutory rights to create living wills and appoint health care agents, the law has evolved to accommodate conflicting views over how life-and-death medical decisions should be made. The new Act fills a statutory gap involving the incompetent patient's right to have a surrogate act on his behalf.
Here, the GAL's arguments were sincere and zealous as he spoke out for the highest standards and levels of proof. We agree that when an adult patient's desires can be determined, by clear and convincing evidence, that determination prevails. We find invalid, however, the GAL's underlying assumption that C.A.'s guardian, doctors, and parents lacked the right to decide on C.A.'s behalf whether resuscitative measures should be continued, given her medical condition and prognosis. The courts are not paralyzed when the ultimate decision is who should make such a decision. Here, the court considered the evidence and law and determined that the guardian should, in essence, be given the same right as a parent to concur with the doctors' medical judgment that a DNR order might become necessary and proper given C.A.'s condition.
For the foregoing reasons, we affirm the ruling of the trial court.
Affirmed.
JIGANTI, P.J., concurs.
McMORROW, J., dissents.
McMORROW, Justice, dissenting:
The guardian in the present case, appointed by the court under the Juvenile Court Act (Ill.Rev.Stat.1991, ch. 37, par. 801-1 et seq.), seeks the authority to consent to the placement of a "do not resuscitate" (DNR) order on the medical charts of his ward, C.A., an infant adjudged abused and neglected who was born prematurely and diagnosed as infected by the human immunodeficiency virus (HIV) when the baby was less than a year old. The majority holds that the guardian should consent to the placement of a DNR order on the medical charts of C.A. at such time as the treating physicians find it to be appropriate *1185 based on her terminal condition. 236 Ill. App.3d at 612, 177 Ill.Dec. at 808, 603 N.E.2d at 1182.
In so ruling, the majority relies upon the supreme court's decisions in In re Estate of Longeway (1989), 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 and In re Estate of Greenspan (1990), 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194. Although declining to apply the provisions of the Health Care Surrogate Act (Ill.Rev.Stat.1991, ch. 110½ par. 851-1 et seq.), which became effective shortly after the trial court's order was entered in the case at bar, the majority nonetheless notes the principles stated in the Act in reaching its conclusions.
I agree that Illinois law allows a court appointed guardian under the Juvenile Court Act to withhold certain life-saving medical treatment[1] in the care of a minor child under certain circumstances. I also agree that the proper standard is whether the withholding or withdrawal of a life-saving medical treatment would be in the best interests of the child.
However, I am unable to agree with the majority disposition because I find it in direct conflict with the Illinois Supreme Court's decisions in Longeway and Greenspan. The record in the present case demonstrates without equivocation that C.A. is not "terminally ill," as her death is not imminent and the administration of a resuscitative efforts would not, on this record, merely "prolong the dying process." In addition, the infant is not in a permanently comatose or chronically vegetative state. She is mentally alert, interacts socially with others, and is able to breathe without mechanical intervention. Neither of the physicians who testified at the trial court's hearing could specify when the child is likely to die, and only one doctor, Dr. Simmons, ventured the broad opinion that it would be in the infant's best interests that a DNR order be placed on the child's medical charts.
I also disagree with the majority's refusal to apply the provisions of the Health Care Surrogate Act. The trial court retains jurisdiction over the proper medical care to be administered to C.A. as long as she remains a ward of the court. The issues presented in this appeal should therefore be resolved according to the law currently in effect, i.e., the Health Care Surrogate Act. In my opinion, the trial court's order should be vacated and the parties directed to comply with the provisions of the Health Care Surrogate Act.
This dissent will initially present my disagreement with the majority holding based on the failure of the majority to comply with the requirements enunciated in the Longeway and Greenspan cases, and will then consider the issues in this case under the Health Care Surrogate Act.

I
I am unable to agree with the majority's reasoning in this case, as it is in direct conflict with the Illinois Supreme Court's decisions in Longeway, 133 Ill.2d 33, 139 Ill.Dec. 780, 549 N.E.2d 292 and Greenspan, 137 Ill.2d 1, 146 Ill.Dec. 860, 558 N.E.2d 1194. In both of those decisions, the Illinois Supreme Court held that a patient has a common law right to refuse medical treatment, including artificial nutrition and hydration, and that where the patient is incompetent, this right may be exercised by a guardian as the patient's surrogate. (Greenspan, 137 Ill.2d at 16, 146 Ill.Dec. 860, 558 N.E.2d 1194, citing Longeway, 133 Ill.2d at 44-46, 139 Ill.Dec. 780, 549 N.E.2d 292.) The court further held that, "pending any constitutionally permissible modification of the common law by the legislature, a surrogate can exercise the right for an incompetent patient only if" (Greenspan, 137 Ill.2d at 16, 146 Ill.Dec. 860, 558 N.E.2d 1194 (emphasis added)) the following criteria are satisfied:
"(1) the incompetent is terminally ill * * *, i.e., the patient's condition is incurable *1186 and irreversible so that death is imminent and the application of death-delaying procedures serves only to prolong the dying process;
(2) the incompetent has been diagnosed as irreversibly comatose or in a persistently vegetative state;
(3) the incompetent's attending physician and at least two other consulting physicians have concurred in the diagnosis;
(4) the incompetent's right outweighs any interests of the State, as it normally does;
(5) it is ascertained, by an appropriate meanse.g., by the procedure of substituted judgment on the basis of clear and convincing evidence * * *what the incompetent presumably would have decided, if competent, in the circumstances; and
(6) a court enters an order allowing the surrogate to exercise the incompetent's right to refuse the treatment." Greenspan, 137 Ill.2d at 16, 146 Ill.Dec. 860, 558 N.E.2d 1194.
Application of these factors to the present case reveals that the majority's disposition is in contradiction to the Illinois Supreme Court's requirements in Longeway and Greenspan.
The first criteria enunciated by the supreme court for a surrogate to refuse to provide lifesaving medical treatment is that the patient be terminally ill, i.e., the patient's condition is incurable and irreversible and his death imminent, such that administration of the life-sustaining medical treatment serves only to prolong the dying process. In the present case, the majority determines that C.A. is "terminally ill" because she suffers from HIV. (See 236 Ill.App.3d at 611, 177 Ill.Dec. at 808, 603 N.E.2d at 1182 (wherein the majority states that "both doctors Simmons and Gath agreed that the child was in fact under a death sentence because of her HIV infection and profoundly compromised immune system").) The majority also finds it persuasive that the child was "critically ill" when "the DNR order was initially sought in the pending case" and observes that "[h]er condition at that time could well have been viewed as one in which death was imminent and resuscitative procedures would serve only to prolong the dying process." 236 Ill.App.3d at 611, 177 Ill. Dec. at 808, 603 N.E.2d at 1182 (emphasis added).
I find the majority's reasoning disingenuous. I cannot agree with the majority's characterization of C.A.'s condition as terminally ill simply because she was allegedly "critically ill" when the guardian's petition was filed. In my view, the supreme court's decisions in Longeway and Greenspan do not allow for the withholding of a life-saving medical treatment from every patient who is critically ill. The circumstance that cardiac or respiratory arrest will almost certainly cause the patient to die, if resuscitative efforts are not administered, does not transform a critically ill patient's medical condition into a "terminal illness."
In addition, I cannot agree with the majority's characterization of C.A.'s condition as a "death sentence" because the child is HIV-infected. The health care professionals in this case testified that, based upon statistics, C.A. is not likely to live beyond her third or fourth birthday. However, at the time of the trial court's hearing, C.A. was less than a year old; she is now almost two years of age. Consequently, C.A. has at least another year before she will be three years old. Thus, the statistical data to which the physicians referred does not support a conclusion that the infant's death is "imminent." In fact, not one of the physicians testified that the infant will likely die within the next few days, weeks, or months.
I would also note that the child's treating physician, Dr. Simmons, testified that she believed a DNR order should be placed on the baby's medical charts immediately. However, Dr. Elizabeth Gath testified that a DNR order would be appropriate if "resuscitative efforts would be futile." There is no medical evidence in the record to suggest that resuscitation would be futile if the child suffers cardiac or respiratory arrest, given the infant's medical condition at the time of the trial court's hearing.
*1187 With respect to the second requirement of Longeway and Greenspan, that the patient be diagnosed as either irreversibly comatose or in a chronic vegetative state, the majority observes, "Like the elderly patients in Greenspan and Longeway, however, C.A. has no true awareness of her condition, and her age and impaired neurological development means she will remain unable to appreciate her situation." 236 Ill.App.3d at 610, 177 Ill.Dec. at 807, 603 N.E.2d at 1181.
I find no support in the record for the majority's lame attempt to analogize C.A.'s medical diagnosis to the severely debilitated conditions of the patients in Longeway and Greenspan. The testimony presented to the trial court established without contradiction that C.A. is aware of her surroundings and can and does interact socially with others. It is only in the sense that the child is not able to understand the scope of her medical condition that the infant can be said to be "unaware of her condition" or that the child "will remain unable to appreciate her situation," as characterized by the majority. However, there is no evidence in the record that demonstrates or implies that C.A.'s medical condition was comparable to the medical conditions in Longeway or Greenspan, where the adult patients were in a permanently comatose or chronically vegetative state with no chance of ever regaining consciousness.
In contrast, the record here shows that C.A. is mentally alert, able to function socially, and can breathe without mechanical intervention. Her only current symptoms are that she cannot eat normally and must be fed with artificial nutrition. More importantly, she suffers no current symptoms from her status as HIV-infected. She was neuro developmentally delayed, but the physicians testified that they could not predict the course of her future development, and conceded that she might improve as she matures. The doctors were also unable to testify that the child's inability to eat without artificial nutrition would continue throughout the remainder of her life, and admitted that this condition, too, might improve as the child ages. In short, C.A.'s condition is not even faintly similar to the patients in Longeway and Greenspan.
The third criteria stated by the supreme court is also lacking in the present appeal, i.e., that the patient's attending physician, and at least two other consulting doctors, concur in the patient's diagnosis as terminally ill. In the case before us, only two physicians testifiedDr. Simmons, the child's treating physician, and Dr. Gath, a consulting physician. Thus, the record before us does not contain sufficient health care consensus on C.A.'s medical condition. In addition, neither of the physicians testified that C.A. is terminally ill, as that term is defined by the supreme court in Longeway and Greenspan.
The fourth factor stated by the supreme court is whether the patient's right to forgo the life-saving medical treatment outweighs the State's interests. In this regard, the court specified four countervailing State interests: to preserve life, protect the interests of innocent third parties, prevent suicide, and maintain the ethical integrity of the medical profession. (See Longeway, 133 Ill.2d at 48, 139 Ill.Dec. 780, 549 N.E.2d 292.) The Longeway court observed that "[n]ormally, none of these interests will override a patient's refusal" of the life-saving medical treatment. (133 Ill.2d at 48, 139 Ill.Dec. 780, 549 N.E.2d 292.) This analysis assumes that the patient's medical condition falls within the scope defined by the supreme court, i.e., that the patient is terminally ill and has been diagnosed as either irreversibly comatose or in a persistently vegetative state. Because the child here does not suffer from such a medical condition, considering the State's countervailing interests in this regard is premature and improper.
The fifth step stated by the supreme court is to determine what the patient, if competent, would have decided under the circumstances, i.e., the substituted judgment test. I have no quarrel with the majority's determination that the best interests of the child standard should apply to this case, rather than the substituted judgment test. (See Curran v. Bosze (1990), 141 Ill.2d 473, 153 Ill.Dec. 213, 566 *1188 N.E.2d 1319.) However, I cannot agree with the majority's decision that the DNR order will be in C.A.'s best interests.
As stated previously, the record here demonstrates that C.A. is not terminally ill, since her death is not "imminent" and the withholding of resuscitative efforts would not serve to merely "prolong the dying process." Moreover, the infant is not in a permanently comatose or chronically vegetative state. Notwithstanding these circumstances, the majority believes that the placement of a DNR order on the child's medical charts will be appropriate at such time as the treating physicians find it to be appropriate based on her terminal condition. (236 Ill.App.3d at 612, 177 Ill.Dec. at 808, 603 N.E.2d at 1182.) Two considerations stated by the majority appear to be particularly significant. The first of these is the circumstance that "DNR orders are constantly reviewed by medical personnel and are not necessarily permanent." (236 Ill.App.3d at 611, 177 Ill.Dec. at 808, 603 N.E.2d at 1182.) The second is the majority's expressed concern that judicial proceedings are time-consuming and that "because of the emergency nature of these types of decisions [with respect to whether resuscitative efforts should be withheld], courts may not be able to act fast enough." (236 Ill.App.3d at 614, 177 Ill.Dec. at 810, 603 N.E.2d at 1184.) These considerations would be significant if C.A. were terminally ill and in a permanently comatose or chronically vegetative condition. But she quite simply is not.
I find nothing in the majority's analysis that specifies the precise circumstances presented in this case that would warrant the majority's failure to adhere to the precedent set down by the Illinois Supreme Court in Longeway and Greenspan requiring that the patient be terminally ill and either permanently comatose or in a chronically vegetative condition. I would note that the Health Care Surrogate Act creates an additional category of "qualifying conditions" where the patient is suffering from an incurable or irreversible condition. The Act defines this qualifying condition as an "illness or injury (i) for which there is no reasonable prospect of cure or recovery, (ii) that ultimately will cause the patient's death even if life-sustaining treatment is initiated or continued, (iii) that imposes severe pain or otherwise imposes an inhumane burden on the patient, and (iv) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit." (Ill.Rev.Stat.1991, ch. 110½ par. 851-10.) However, the majority refuses to apply the Health Care Surrogate Act to this appeal. And, as noted more fully below with respect to the Health Care Surrogate Act, the additional requirements of the Health Care Surrogate Act regarding certification of the patient's medical condition by two physicians who have personally examined the patient (see Ill.Rev.Stat.1991, ch. 110½, par. 851-10, 851-20) have not been satisfied in the case before us. Thus, there is no Illinois precedent that justifies the majority's disposition in the instant cause.
I am troubled by the majority's ruling because, in my judgment, it lacks sound precedential value with respect to the legality of withholding life-saving medical treatments, unnecessarily chips away at our supreme court's pronouncements in Longeway and Greenspan, and also is in contravention to the Health Care Surrogate Act. The majority holds that the guardian should consent to the placement of a DNR order on this child's medical charts at such time as the treating physicians find it to be appropriate based on her terminal condition. (236 Ill.App.3d at 612, 177 Ill.Dec. at 808, 603 N.E.2d at 1182.) But this holding merely begs the essential question in this case: At what point will it be "appropriate," based on C.A.'s medical condition, to withhold resuscitative efforts? The majority never addresses this issue, and certainly now is not the "appropriate" time based upon the requirements of Longeway, Greenspan, or the Health Care Surrogate Act.
I note that the majority's disposition is also unsupported by the cases from other jurisdictions to which the majority refers. In none of those decisions did the court authorize the entry of a DNR order on the medical chart of an alert, conscious child, *1189 whose death was not imminent and whose prospect for future neurological development was unclear. See Custody of a Minor (1982), 385 Mass. 697, 434 N.E.2d 601; In re Guardianship of Hamlin (1984), 102 Wash.2d 810, 689 P.2d 1372; In re L.H.R. (1984), 253 Ga. 439, 321 S.E.2d 716; see generally Annot., 48 A.L.R.4th 67 (1986).

II
In my opinion, the provisions of the Health Care Surrogate Act are applicable to the issues presented in this appeal. In a proceeding under the Juvenile Court Act for the care of a minor adjudged abused or neglected and placed with the DCFS, the trial court retains on-going jurisdiction over the child so long as the minor remains a ward of the court. (See, e.g., In re Shawn B. (1991), 218 Ill.App.3d 374, 161 Ill.Dec. 142, 578 N.E.2d 269.) Consequently, the trial court's order in the instant cause determines the scope and proper exercise of the guardian's on-going authority to consent to the withholding of resuscitative efforts in C.A.'s behalf. Although the Health Care Surrogate Act did not become effective until a few days after the trial court's decision, the question of whether the guardian in this case is currently authorized to consent to the placement of a DNR order on C.A.'s medical charts is properly resolved by the law currently in effect, i.e., the Health Care Surrogate Act. See, e.g., Bates v. Board of Education (1990), 136 Ill.2d 260, 144 Ill.Dec. 104, 555 N.E.2d 1; Rios v. Jones (1976), 63 Ill.2d 488, 348 N.E.2d 825.
In the Health Care Surrogate Act, the Illinois General Assembly enacted comprehensive guidelines for the circumstances and procedures under which a life-saving medical treatment may lawfully be withheld or withdrawn in the medical care for all persons in this State. (Ill.Rev.Stat.1991, ch. 110½ par. 851-1 et seq.; see generally Fatum, Kane, and LeBlang, "A Review of the Illinois Health Care Surrogate Act," 80 Ill.Bar J. 124 (1992).) The Health Care Surrogate Act recognizes the "fundamental right" of all individuals to forgo a life-sustaining medical treatment under certain circumstances, without regard to the person's failure or inability to execute a living will or power of attorney for health care, and regardless of whether the person lacks the decisional capacity to choose to forgo a life-sustaining medical treatment. (Ill.Rev. Stat.1991, ch. 110½ par. 851-5(a).) Its purpose is to establish a process for private decision-making, without prior judicial approval, for the withdrawal or withholding of life-saving medical treatment. (Ill.Rev. Stat.1991, ch. 110½ par. 851-5(b).) Its terms explicitly apply to the rights of a minor to forgo a life-saving medical treatment under the pertinent requirements of the statute. See, e.g., Ill.Rev.Stat.1991, ch. 110½, par. 851-55.

A. Powers of Juvenile Court Act Guardian Under Health Care Surrogate Act
Based upon the pertinent provisions of the Health Care Surrogate Act, I conclude that a court appointed guardian under the Juvenile Court Act is granted the power to act as a surrogate decision maker on behalf of the guardian's minor ward, and to decide whether a life-saving medical treatment should be withheld or withdrawn in the minor's medical care.
The Health Care Surrogate Act sets forth a prioritized list of persons who may qualify as surrogate decision maker on behalf of a patient who lacks decisional capacity and suffers from a qualifying condition. (See Ill.Rev.Stat.1991, ch. 110½, par. 851-25(a).) With respect to a patient who is an unemancipated minor and has no spouse or children, this listing of priority is: (1) the child's guardian of the person; (2) either parent of the child; (3) any adult brother or sister of the patient; (4) a close friend of the patient; and (5) the child's guardian of the estate. Ill.Rev.Stat.1991, ch. 110½, par. 851-25(a).
The Act defines a "guardian" as "a court appointed guardian of the person who serves as a representative of a minor or as a representative of a person under legal disability." (Ill.Rev.Stat.1991, ch. 110½, par. 851-10.) Although this definition of "guardian" does not explicitly refer to a *1190 court appointed guardian under the Juvenile Court Act, the inclusion of a court appointed guardian under the Juvenile Court Act is consistent with the objectives of the Health Care Surrogate Act. The fundamental purpose of the Health Care Surrogate Act is to set forth a comprehensive scheme allowing for private decision making in health care treatments without a prior court determination, in order to preserve the dignity of the patient and to relieve the anguish associated with such decisions. In view of the comprehensive purpose of the statute, I do not believe that our Legislature intended to deprive children, who have been adjudged abused or neglected, of the benefits of the Health Care Surrogate Act.
Moreover, recognition of such a power in a court appointed guardian under the Juvenile Court Act is consistent with the broad powers conferred on a guardian for a child who has been adjudged abused or neglected. The Juvenile Court Act defines "guardianship of the person" as "the duty and authority, subject to residual parental rights and responsibilities, to make important decisions in matters having a permanent effect on the life and development of the minor and to be concerned with his or her general welfare." (Ill.Rev.Stat.1991, ch. 37, par. 801-3(8).) The Act further states that this authority "includes but is not necessarily limited to * * * the authority to consent to * * * a major medical, psychiatric, and surgical treatment * * *." Ill.Rev.Stat.1991, ch. 37, par. 801-3(8)(a) (emphasis added).
The trial court and the court appointed guardian properly took into account the wishes of C.A.'s biological parents. In so doing, the guardian preserved the parent's residual rights and responsibilities under the Juvenile Court Act (see Ill.Rev.Stat. 1991, ch. 37, par. 801-3(13)) as well as their right to notice under the Juvenile Court Act. Smith-Hurd Ann.Stat., ch. 37, par. 801-5 (as amended effective July 1, 1992); see also Ill.Rev.Stat.1991, ch. 110½, par. 851-10 (defining "parent" under Health Care Surrogate Act as "person who is the natural or adoptive mother or father of the child and whose parental rights have not been terminated by a court of law"); Santosky v. Kramer (1982), 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 ("fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State * * * [e]ven when blood relationships are strained, parents retain a vital interest in preventing the irretrievable destruction of their family life").

B. Propriety of DNR Order Under Health Care Surrogate Act
Under the Act, the withholding or withdrawal of a life-saving medical treatment may be authorized where a patient suffers from a "qualifying condition." The statute defines this term as follows:
"the existence of one or more of the following conditions in a patient certified in writing in the patient's medical record by the attending physician and by at least one other qualified physician:
(1) `Terminal condition' means an illness or injury for which there is no reasonable prospect of cure or recovery, death is imminent, and the application of life-sustaining treatment would only prolong the dying process.
(2) `Permanent unconsciousness' means a condition that, to a high degree of medical certainty, (i) will last permanently, without improvement, (ii) in which thought, sensation, purposeful action, social interaction, and awareness of self and environment are absent, and (iii) for which initiating or continuing life-sustaining treatment, in light of the patient's medical condition, provides only minimal medical benefit.
(3) `Incurable or irreversible condition' means an illness or injury (i) for which there is no reasonable prospect of cure or recovery, (ii) that ultimately will cause the patient's death even if life-sustaining treatment is initiated or continued, (iii) that imposes severe pain or otherwise imposes an inhumane burden on the patient, and (iv) for which initiating or continuing life-sustaining treatment, in light *1191 of the patient's medical condition, provides only minimal medical benefit." Ill. Rev.Stat.1991, ch. 110½, par. 851-10.
The record of the trial court's proceedings in the case before us does not contain sufficient evidence to determine whether C.A.'s medical condition fell within one of the qualifying conditions stated in the Health Care Surrogate Act. Under the Act, when a patient suffers from a qualifying condition, the treating physician must certify in writing, in the patient's medical records, the patient's diagnosis and prognosis for recovery. (Ill.Rev.Stat. 1991, ch. 110½, par. 851-10, 851-20.) A second qualified physician, who has personally examined the patient, must also concur in the diagnosis and prognosis of the patient's medical condition as that governed by one of the qualifying conditions stated in the Act. Ill.Rev.Stat.1991, ch. 110½, par. 851-10 (defining "qualified physician" as a physician licensed to practice medicine in Illinois "who has personally examined the patient"); see also Ill.Rev.Stat.1991, ch. 110½, par. 851-20.
At the trial court's proceedings, only one physician, Dr. Simmons, testified that she had personally examined the child. The remaining physician, Dr. Gath, testified that she had only reviewed the infant's medical charts. In order to justify the placement of a DNR order on C.A.'s medical charts, it would be necessary for the child's treating physician, as well as one other physician who has personally examined the infant, to certify in the minor's medical charts that she suffers from one of the qualifying conditions stated in the Act. Because the record does not demonstrate that this requirement has been satisfied, I would vacate the trial court's order with directions that the parties comply with the provisions of the Health Care Surrogate Act.
I note that additional terms of the Health Care Surrogate Act would also be applicable in determining whether resuscitative efforts should be withheld. For example, under the Act, the surrogate's decision to authorize the withholding or withdrawal of a life-saving medical treatment must be stated to the treating physician and at least one adult witness. (Ill.Rev.Stat.1991, ch. 110½, par. 851-20(d).) The physician must then set forth, in the patient's medical records, the surrogate's decision and any discussion with respect thereto, and the adult witness must sign the document. Ill.Rev. Stat.1991, ch. 110½, par. 851-20(d).
According to the Act, a determination that the patient suffers from a qualifying condition "creates no presumption regarding the application or non-application of life-sustaining treatment," but rather provides the circumstances necessary for the surrogate decision maker's consideration of whether to forgo a life-sustaining treatment. (Ill.Rev.Stat.1991, ch. 110½, par. 851-10.) In reaching this decision, "the surrogate shall weigh the burdens on the patient of initiating or continuing life-sustaining treatment against the benefits of that treatment." (Ill.Rev.Stat.1991, ch. 110½, par. 851-10.) In addition, where the patient is a minor, the surrogate "shall take into account any other information, including the views of family and friends, that the surrogate decision maker believes the patient would have considered." (Ill. Rev.Stat.1991, ch. 110½, par. 851-20(b)(1).) Because of the trial court's on-going jurisdiction over the child's care and treatment, the court should be advised of the decision reached by these persons with respect to the placement of the DNR order on the child's chart. See Ill.Rev.Stat.1991, ch. 37, par. 802-28.
Although not mentioned by the parties in the present case, I note that the range of life-saving medical treatments which may lawfully be withheld or withdrawn in the instant cause may not be as broad as that applicable to an adult patient. The Health Care Surrogate Act defines a life-saving medical treatment as follows:
"any medical treatment, procedure, or intervention that, in the judgment of the attending physician, when applied to a patient with a qualifying condition, would not be effective to remove the qualifying condition or would serve only to prolong the dying process." Ill.Rev. Stat.1991, ch. 110½, par. 851-10.
*1192 The Act further provides that a life saving medical treatment may include, but is not limited to, "assisted ventilation, renal dialysis, surgical procedures, blood transfusions, and the administration of drugs, antibiotics, and artificial nutrition and hydration." Ill.Rev.Stat.1991, ch. 110½, par. 851-10.
However, the Health Care Surrogate Act further provides that nothing therein "supersedes the provisions of 45 C.F.R. 1340.15 concerning the provision of `appropriate' nutrition, hydration, and medication for neonates." (Ill.Rev.Stat.1991, ch. 110½, par. 851-40.) This latter provision is a reference to the Child Abuse Prevention and Treatment Act (42 U.S.C. §§ 5101 et seq. (1989)) and its implementing regulation (45 C.F.R. § 1340.15 (1991)), which precondition federal funding for child abuse prevention and treatment programs upon state adoption of procedures or programs for the prompt notification of "suspected medical neglect (including instances of withholding of medically indicated treatment from disabled infants with life-threatening conditions)" and the enactment of appropriate state laws to permit "the State child protective service system to pursue any legal remedies * * * as may be necessary to prevent the withholding of medically indicated treatment from disabled infants with life-threatening conditions." 42 U.S.C. §§ 5106a(b)(10).
Under the applicable implementing regulation for this provision in the Federal Child Abuse Prevention and Treatment Act, an infant is defined as a child under the age of one year. (45 C.F.R. § 1340. 15(b)(3)(i).) However, the regulation also advises that its terms "should be consulted thoroughly in the evaluation of any issue of medical neglect involving an infant older than one year of age who has been continuously hospitalized since birth, who was born extremely prematurely, or who has a long-term disability." (45 C.F.R. § 1340.15(b)(3)(i) (emphasis added).) In addition, the regulation provides in pertinent part as follows:
"The term `withholding of medically indicated treatment' means the failure to respond to the infant's life-threatening conditions by providing treatment (including appropriate nutrition, hydration, and medication) which, in the treating physician's (or physicians') reasonable medical judgment, will be most likely to be effective in ameliorating or correcting all such conditions, except that the term does not include the failure to provide treatment (other than appropriate nutrition, hydration, or medication) to an infant when, in the treating physician's (or physicians') reasonable medical judgment any of the following circumstances apply:
(i) The infant is chronically and irreversibly comatose;
(ii) The provision of such treatment would merely prolong dying, not be effective in ameliorating or correcting all of the infant's life-threatening conditions, or otherwise be futile in terms of the survival of the infant; or
(iii) The provision of such treatment would be virtually futile in terms of the survival of the infant and the treatment itself under such circumstances would be inhumane." (45 C.F.R. § 1340.15(b)(2).
The regulation includes an appendix giving detailed explanations for its provisions, including those quoted above. See 45 C.F.R. Appendix to Part 1340 (1991).
I recognize that the guardian in the present case has not sought the authority to withdraw artificial nutrition or hydration from the minor child here. However, the parties and the trial court are cautioned of the significance of these provisions in the federal statute and its implementing regulations.

C. Constitutionality of Health Care Surrogate Act
The GAL contends that the Health Care Surrogate Act is unconstitutional, as a violation of procedural due process, because it does not require prior judicial intervention and approval of a guardian's decision to consent to the withdrawal or removal of a life-saving medical treatment for the ward. I cannot agree with this argument. Initially, as explained more fully above, the Act *1193 requires specific factual findings by the appropriate health care professionals, as well as consultation with persons committed to and interested in the child's care and welfare. See Ill.Rev.Stat.1991, ch. 110½, pars. 851-10, 851-20.
In addition, the Health Care Surrogate Act contains detailed provision for the possibility of dispute among various persons who are or could be designated as surrogate decision makers. If a guardian has already been appointed, challenge of the guardian's decision may be had in the court where such appointment of guardianship was granted. See Ill.Rev.Stat.1991, ch. 110½, par. 851-55.
In the case before us, the trial court could resolve a dispute between the appropriate persons regarding C.A.'s care and treatment, upon the filing of a supplemental petition raising such issue. (See Ill.Rev. Stat.1991, ch. 37, par. 802-13.) In considering whether the life-saving medical treatment should be withheld or withdrawn, the court must consider the best interests of the child. (See, e.g., Ill.Rev.Stat.1991, ch. 37, par. 802-13; Ill.Rev.Stat.1991, ch. 110½, par. 850-20.) In accordance with Illinois Supreme Court precedent, the applicable standard of proof is that of clear and convincing evidence. See Greenspan, 137 Ill.2d at 18, 146 Ill.Dec. 860, 558 N.E.2d 1194; Longeway, 133 Ill.2d at 51, 139 Ill. Dec. 780, 549 N.E.2d 292.
In considering the sufficiency of the due process protections afforded by a state statute, it is necessary to balance the private interest affected by the official action, "`the risk of an erroneous deprivation of such interest * * * and the probable value, if any, of additional or substitute procedural safeguards,'" and the state's interest, "`including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" Parham v. J.R. (1979), 442 U.S. 584, 599-600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101, quoting Mathews v. Eldridge (1976), 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18.
As applicable to the case before us, the private interests involved in this appeal are the minor's right to adequate medical treatment and her right to forgo a life-saving medical treatment that is not in her best interest. An erroneous deprivation of her right to adequate medical treatment may cause her to suffer either death or a diminished quality of life; an erroneous deprivation of her right to forgo a life-saving medical treatment may cause her to unnecessarily continue to live under inhumane circumstances.
The additional safeguard suggested by the GAL, i.e., prior judicial approval, could well hinder, rather than enhance, the minor's rights in the present case. Although the decision to withhold resuscitative efforts must sometimes be made quickly, judicial proceedings are not well suited or equipped for such short notice decision making. This is one of the concerns the legislature considered in providing for such decisions to be made without prior judicial approval whenever possible. Given the Act's goal of permitting private decision making, the inherent shortcomings in requiring prior judicial approval, and the potential that judicial approval could easily hamper rather than help the minor patient's on-going and timely medical care, I am unable to conclude, on the record before us, that the failure to require prior judicial intervention would violate the procedural due process rights of C.A.
The GAL also contends that the statute violates procedural due process because it does not require that the treating physician, and one other physician who has personally examined the patient, certify that they have determined, by clear and convincing evidence, that the patient suffers from one of the qualifying conditions enumerated in the Health Care Surrogate Act. In addition, the GAL asserts that the Health Care Surrogate Act violates principles of equal protection because it provides for different degrees of medical certainty with respect to each of the three qualifying conditions stated in the statute. I find these arguments to be premature. Because the appropriate physicians in this case have not certified that C.A. suffers from any of the qualifying conditions stated under the *1194 Health Care Surrogate Act, the GAL's arguments are speculative, and I decline to consider them in this appeal.
For the reasons stated, I am unable to concur in the majority's disposition, and respectfully dissent.
NOTES
[1] We recognize that in future cases decided under the Health Care Surrogate Act, the precise issue we decide here involving the juvenile court's authority to approve DNR orders may be moot. The new Act permits a surrogate to consent to such orders on behalf of incompetent minors. Although the new Act contemplates private decision making under the statutory guidelines therein, our opinion in this case affirms the juvenile court's general authority, upon the guardian or other interested party's request, to hear and resolve those issues concerning the ward's welfare. The new Act preserves existing rights under other laws, moreover, including any right to seek judicial review "under the common law or statutes of this State to the extent not inconsistent with the provisions of this Act." Ill.Rev.Stat.1991, ch. 110½, par. 851-55.
[2] A living will allows a person to execute a document that expresses his desire not to be kept alive through artificial or extraordinary means if in the future he suffers a terminal condition. Another option is the appointment of a health care agent, who is vested with the right to make decisions on behalf of the patient when the patient is incapacitated.
[1] I note that the issue in the instant case does not involve the withholding of artificial nutrition, hydration, or medication. Federal law requires the administration of these measures to an infant, irrespective of whether the child is in a comatose condition, a permanently vegetative state, or is terminally ill. See 42 U.S.C. §§ 5106(b)(1), 5106g(10)(1991); 45 C.F.R. § 1340.15 (1991).