GUARDIANSHIP OF ELMA MASON.

No. 96-P-1383.

Middlesex. Suffolk. September 9, 1996. - September 17, 1996.

Present: WARNER, C.J., ARMSTRONG & PERRETTA,, JJ.

*Medicine,* Withholding medical treatment. *Probate Court,* Withholding medical treatment, Incompetent person.

The authority of a temporary guardian, appointed by a probate judge, with respect to decisions pertaining to the ward's health care, may supersede the authority of a health care agent named in a health care proxy, drawn under G. L. c. 201D, §§ 1 et seq., inserted by St. 1990, c. 332, § 1, and executed by the ward prior to the appointment of the guardian, where § 17 of that statute contemplates, in certain circumstances, the overriding of the agent's decisions or his removal. [303-304]

In the circumstances of a proceeding for appointment of a temporary guardian for an ill and elderly ward, the probate judge had ample basis under G. L. c. 201D, §§ 5 and 17, for authorizing the guardian, rather than the ward's health care agent appointed under a health care proxy, to make all health care decisions on behalf of the ward. [304-305]

A probate judge correctly made a substituted judgment determination calling for a "no code" order to be entered on a ward's medical charts, and the evidence supported the judge's findings and conclusions. [305-307]

CIVIL ACTION commenced in the Middlesex Division of the Probate and Family Court Department on July 2, 1996.

After the case was transferred to the Suffolk Division, a motion for substituted judgment determinations, filed on August 23, 1996, was heard by *Elaine M. Moriarty,* J.

An expedited appeal with leave to proceed on the original record was granted by *Perretta,* J.

*Joseph J. Mason,* pro se.

*William S. Carroll* for Massachusetts General Hospital.

*Matthew H. Beaulieu* for Elma Mason.

PERRETTA, J. Pursuant to the motion of the guardian for the ward, Elma Mason, a Probate Court judge made a

substituted judgment determination calling for a "no code"[1] order to be entered on her medical charts. Protesting the appointment of a guardian other than himself and the substituted judgment determination, the ward's son, Joseph Mason, then sought relief from a single justice of this court who declined to stay the Probate Court orders and, instead, granted Joseph an expedited appeal with leave to proceed on the orginal record. See *Care & Protection of Beth*, 412 Mass. 188, 192 n.7 (1992). We affirm the decision and orders.

1. *The facts.* Elma Mason is seventy-seven years of age and suffers from numerous serious medical conditions: congestive heart failure, anemia, insulin dependent diabetes mellitus, reflux, pulmonary hypertension, renal insufficiency, psychotic depression and mild dementia, and, as most recently contracted, a serious blood infection. There is no dispute that Elma Mason is mentally incompetent. According to Joseph, he has been his mother's companion and caretaker for between seven to ten years, and there is documentary evidence showing that he was appointed her temporary guardian on February 22, 1996.[2] At that time, the ward was a patient at Massachusetts General Hospital (MGH). She was thereafter transferred to a nursing home where she remained until June 18. On that date, Joseph charged the nursing home with abuse and neglect and arranged for her transfer back to MGH.

Although Joseph's appointment as temporary guardian had expired, he made no effort at renewal until sometime in late June or early July, when MGH sought the appointment of a guardian ad litem to investigate and report to the Middlesex Probate Court on the issue who should be appointed as the ward's guardian.[3] As represented by MGH, the investigation was required on the basis that the ward no longer had a guardian, see note 2, *supra*, and that MGH was "concerned that the actions of Joseph Mason will interfere with his mother's care and treatment." Numerous affidavits, copies of

[1]See *Matter of Dinnerstein*, 6 Mass. App. Ct. 466, 469 n.3 (1978).

[2]Because the appointment expired, as matter of law, on May 1, 1996, we need not consider whether Joseph's failure to comply with the notice requirements of Rule 29B of the Probate Court Rules (as amended effective February 1, 1982) invalidated the appointment.

[3]These proceedings were commenced in the Middlesex Probate Court on the basis of Joseph's representations that the ward resided in Cambridge, presumably the Youville Hospital where she had resided near the time of Joseph's appointment as temporary guardian in February.

police reports, and warning letters to Joseph from various health care providers were attached to the motion to support MGH's claim of concern. It appears from those attachments that Joseph was disruptive of hospital schedules, abusive to medical personnel, and overly quick to allege neglect and maltreatment of his mother. Joseph filed a cross complaint seeking his own appointment as guardian.

Two weeks after his appointment, the guardian ad litem filed his report in which, after investigation, he concluded: "The G.A.L. cannot recommend that Joseph Mason be named as guardian of his mother, but believes that if a suitable person is found they will need very clear authority from [the] Court to be able to limit the way in which Mr. Mason may attempt to undermine their authority or to interfere with the care to be provided to Elma Mason."

Based upon the guardian ad litem's report, MGH moved for the appointment of a temporary guardian for Elma Mason and nominated Richard Ready, R.N., Esq. Joseph Mason opposed any action by the Middlesex Probate Court on the ground that his mother was a resident of Suffolk and not Middlesex County. The judge appointed Mr. Ready as temporary guardian of Elma Mason and ordered the case transferred to Suffolk County.

By the decree of temporary guardianship, Mr. Ready is authorized to make "all usual and customary" medical and placement decisions in respect to the ward. In addition, the decree also authorizes Mr. Ready to make "all decisions" regarding who visits the ward, when the visits shall occur, and whether the visits shall be supervised. He is also authorized to suspend visits to the ward "if necessary," and he has "exclusive access to the ward's medical record unless . . . [he] believes that it is in the ward's best interest to authorize others to have access to the record."

On or about August 22, MGH filed a "motion for . . . substitute judgment determinations" in the Suffolk Probate Court. A guardian ad litem was appointed to investigate and report on the issue of whether a substituted judgment determination calling for a "no code" order should be entered on Elma Mason's medical charts. Counsel for the ward was also appointed. After the guardian ad litem filed his report, a

hearing was held on MGH's motion.[4] At that hearing, Joseph challenged the temporary guardian's right to act on Elma's behalf and presented a durable power of attorney executed by his mother on March 8, 1995 (see G. L. c. 201B),[5] and a health care proxy which Joseph executed under the power of attorney on January 3, 1996, naming himself as Elma Mason's health care agent.[6] Although the Probate Court judge received the documents in evidence, she ruled that the issue of whether a temporary guardian should be appointed for Elma had been determined previously and that the only issue presently before her was the substituted judgment question.

Based upon the evidence presented, which included the report of the guardian ad litem, medical affidavits, and the testimony of Elma's physician and Joseph, the judge issued findings of fact on the relevant substituted judgment factors and concluded that Elma Mason was "to have a do not resuscitate order instituted regarding her care, and that she not undergo any futile invasive measures that would only serve to prolong her life unnecessarily." However, she is to continue "to be given usual and customary medical treatment and hydration and pain medication."

2. *The health care proxies.* There are two health care prox-

---

[4]Although the hearing was electronically recorded, the expedited schedule for the appeal did not allow for the preparation of a transcript. However, the tapes of that hearing were transmitted to the court with the original record.

[5]General Laws, c. 201B, § 1, inserted by St. 1981, c. 276, § 2, provides:

"(a) A durable power of attorney is a power of attorney by which a principal, in writing, designates another as his attorney in fact and the writing contains the words, 'This power of attorney shall not be affected by subsequent disability or incapacity of the principal,' or 'This power of attorney shall become effective upon the disability or incapacity of the principal,' or similar words showing the intent of the principal that the authority conferred shall continue notwithstanding the subsequent disability or incapacity of the principal.

"(b) References in this chapter to the disability or incapacity of the principal shall mean the mental illness or other disability of the principal recognized under the General Laws."

[6]A health care agent, as defined by G. L. c. 201D, § 1, inserted by St. 1990, c. 332, § 1, is "an adult to whom authority to make health care decisions is delegated under a health care proxy."

ies in the papers before us, one which was executed by Joseph on January 3, 1996, under his durable power of attorney, and one which was purportedly executed by the principal, Elma, on January 12, 1993.[7] Each designates Joseph as Elma's health care agent. His powers and responsibilities as such are set out in G. L. c. 201D, § 5, inserted by St. 1990, c. 332, § 1, which provides in relevant part:

> "An agent shall have the authority to make any and all health care decisions on the principal's behalf that the principal could make, including decisions about life-sustaining treatment, subject, however, to any express limitations in the health care proxy.

> "After consultation with health care providers, and after full consideration of acceptable medical alternatives regarding diagnosis, prognosis, treatments and their side effects, the agent shall make health care decisions: (i) in accordance with the agent's assessment of the principal's wishes, including the principal's religious and moral beliefs, or (ii) if the principal's wishes are unknown, in accordance with the agent's assessment of the principal's best interests.

> "Notwithstanding any general or special law to the contrary, the agent shall have the right to receive any and all medical information necessary to make informed decisions regarding the principal's health care, including any and all confidential medical information that the prinicpal would be entitled to receive.

> "Health care decisions by an agent pursuant to a health care proxy on a principal's behalf shall have the same priority over decisions by any other person, including a person acting pursuant to a durable power of attorney as would decisions by the principal, when competent, except as otherwise provided in the health care proxy or by specific court order overriding the proxy."

Although the 1996 proxy was introduced in evidence at the

---

[7]Although there are serious unresolved questions concerning the execution of each of the proxies, we assume for purposes of decision that they are valid.

hearing on MGH's motion for substituted judgment determinations, the parties do not dispute that it was not presented to the Probate Court judge during the proceedings in Middlesex on the cross complaints seeking the appointment of a temporary guardian for Elma. There is dispute, however, whether the 1993 health care proxy in the original papers was before the judge in the Middlesex Probate Court. The document itself does not reflect that it was received in evidence, and Joseph stands alone in insisting that the judge had that proxy during those proceedings.

We will assume for purposes of decision that the Middlesex Probate Court judge had the 1993 proxy before her at the time of the appointment of Mr. Ready as Elma's temporary guardian.[8] By reason of the guardianship decree, the exclusive authorizations granted Joseph under the proxy and G. L. c. 201D, § 5, were taken from him and conferred upon Mr. Ready. Under G. L. c. 201D, § 17, it was open to the judge to take such action. That statute, inserted by St. 1990, c. 332, § 1, provides:

> "The health care provider, the conservator for, or guardian of the principal, members of the principal's family, a close friend of the principal, or the commissioner of public health may commence a special proceeding in a court of competent jurisdiction, with respect to any dispute arising under this chapter, including, but not limited to, a proceeding to:
>
> (i) determine the validity of the health care proxy;
>
> (ii) have the agent removed on the ground that the agent is not reasonably available, willing and competent to fulfill his or her obligations under this chapter or is acting in bad faith; or

[8]Notwithstanding this assumption, we think it unlikely that the proxy was presented to the judge. As noted in the report of the guardian ad litem who investigated the issue of whether a temporary guardian should be appointed, which report was relied upon the judge in making her decision: "Mr. Mason claims to have been designated as his mother's health-care proxy, although he had not produced the forms for the G.A.L. as of the writing of this report, despite multiple requests from the G.A.L. that Mr. Mason provide those forms."

(iii) override the agent's decision about health care treatment on the grounds that: the decision was made in bad faith or the decision is not in accordance with the standards set forth in section five."

In the procedural circumstances of this case, it is reasonable to treat MGH's complaint for the appointment of a temporary guardian for Elma as also seeking an override of Joseph's decisions concerning her health care treatment. Based upon the report of the guardian ad litem, we conclude that the judge had ample basis for authorizing a person other than Joseph to make health care decisions on behalf of Elma.

As reported by the guardian ad litem, interviews with various health care providers who had worked with Elma and Joseph over the past five years revealed that they found Joseph to be of the view that he is the only person capable of implementing a suitable treatment program for his mother, he is "articulate, but is not a good listener," he is "hostile toward" his mother's caretakers and often behaves in a "belligerent or inappropriate manner toward them," his decisions concerning his mother, although well-motivated, are not always sound, health care providers have declined to take on the mother as a client or patient because of Joseph's behavior, he argues with health care providers, and attempts "to micromanage every aspect of his mother's life and care," he "has difficulty accepting the change in his mother's health status and is experiencing a lot of denial about the deterioration in his mother the past year," he is too "combative" to work with, and he does not have the "objectivity necessary to be the substitute decision maker for his mother."

The guardian ad litem also spoke with Joseph. He described him as demanding and "display[ing] signs of distrustfulness and paranoia." He carries a portable tape recorder into which he dictates throughout the day, noting dates, times, and observations about his immediate surroundings, and he advised the guardian that he intended to hire a private investigator to delve into the guardian's relationship with counsel for MGH.

These interviews led the guardian ad litem to report to the court: "Despite Elma Mason's past expressed preference, the G.A.L. does not believe Joseph Mason is suitable to be appointed Temporary Guardian. Mr. Mason is unable to

Guardianship of Mason.

objectively separate his mother's needs from his own and/or to prioritize her needs. He has demonstrated a poor ability to work cooperatively with several different care providers (Hospital staff, Nursing Home staff, home caregivers and multiple physicians). Mr. Mason has misrepresented or withheld information from the court. Mr. Mason has refused to listen to explanations about the court proceedings or has been unable or unwilling to understand the court proceedings. He demonstrates a level of paranoia and mistrust which will make it difficult for care providers to work with him on his mother's behalf."

This information shows that Joseph refuses to give "full consideration of acceptable medical alternatives regarding [Elma's] diagnosis, prognosis, treatments and their side effects" and that he is incapable of making health care determinations based upon a true assessment of Elma's best interests. Such a showing is more than sufficent to warrant a conclusion that Joseph, as Elma's health care agent, had not made and would not make decisions in accordance with the standards set out in G. L. c. 201D, § 5. The Probate Court judge, therefore, was correct in overriding all Joseph's current and future medical decisions for Elma, see G. L. c. 201D, § 17, and appointing a suitable temporary guardian to act on her behalf. .

3. *The "no code" determination.* "Generally, 'no code' orders do not require judicial oversight. See *Matter of Dinnerstein,* 6 Mass. App. Ct. 466, 474-475 (1978). Cf. *Brophy* v. *New England Sinai Hosp., Inc.,* 398 Mass. 417, 423 (1986) . . . Courts should not be in the business of reviewing uncontroversial 'no code' cases simply because doctors and hospitals seek to shield themselves from liability." *Care & Protection of Beth,* 412 Mass. at 193. We do not regard this case as one where MGH simply seeks to shield itself from liability. Rather, it is a situation complicated by the fact that the "no code" order was obtained over the objection of Joseph who holds health care proxies of questionable validity. We think that "[i]n these circumstances, a judicial 'no code' determination is appropriate." *Id.* at 194. See also *Matter of Spring,* 380 Mass. 629, 636-637 (1980).

As earlier noted, when MGH sought a "no code" order, the Suffolk Probate Court judge appointed a guardian ad litem as well as counsel for the ward and thereafter conducted

an evidentiary hearing. In doing so, she also had before her, pursuant to the transfer order made by the Middlesex Probate Court judge, all the papers that had been filed on the cross complaints for the appointment of a guardian in Middlesex County.

Throughout the proceedings Joseph again asserted that he had the exclusive right under the health care proxies to make all decisions concerning the medical treatment to be provided his mother. The judge repeatedly advised him that the issue of his agency under the proxies had been decided previously and that the sole issue before her was whether a "no code" order would be entered on his mother's medical chart.

At the evidentiary hearing, Joseph's only refutation of the medical evidence was his testimony challenging the past medical treatment given his mother by various physicians at MGH. His opposition to the "no code" order was based solely upon his belief that his mother's current condition, attendant suffering, and poor prognosis, has been brought about by the painkillers and sedatives given her and that if these medications were stopped, his mother would improve and there would be no need even to consider a "no code" order.

The judge accepted the testimony of the ward's treating physician who stated that the ward suffers from multiple system failure; that the disputed medications were administered only when various necessary medical procedures, such as dialysis, were performed, and then only for the purpose of making her calm and comfortable; that the dosages of the medications were set at levels carefully balanced to prevent any allergic reaction; and that although the ward had not received any disputed medication within six days of the hearing, her condition had not improved. The physician further testified that the ward's underlying organ failures are not likely to be cured and that she will continue to decline and suffer the physical trauma of the invasive measures of resuscitation, should such an attempt be made.

In addition to making findings on the medical evidence, the judge considered other factors relative to a substituted judgment determination, including the facts that the ward's religious convictions and beliefs did not have any impact on any decision concerning her treatment program and that the

ward's family, other than Joseph, did not oppose the order.[9] See *Care & Protection of Beth*, 412 Mass. at 195, and cases therein cited.

On appeal, Joseph's arguments continue to be that he has the sole right to make medical decisions for his mother and that it would be her wish, based upon his contention that her condition would improve if her medication was stopped, to take any and all measures to resuscitate her should her cardiopulmonary system suffer another failure. There is no basis for disturbing the judge's findings.[10]

The temporary guardianship decree, the substituted judgment decision, and the entry of the "do not resuscitate" order are affirmed.

*So ordered.*

---

[9]The ward has two brothers and three sons. Joseph is not close to his brothers, and the record indicates that he has sought restraining orders to keep one brother away from the mother, that he never notified them of his earlier appointment as temporary guardian, see note 2, *supra*, and that he did not volunteer their addresses to the guardians ad litem in these proceedings so that they could be interviewed.

[10]The judge also ordered that the temporary guardian was to meet with Joseph weekly to review his mother's medical status and to keep her family informed of her prognosis and the nature of her medications.